UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ANA SALAZAR, MARILYN MERCADO, ANA
BERNARDEZ and JEANNETTE POOLE, on behalf
of themselves and all others similarly situated,

                          Plaintiffs,

           -against-

ARNE DUNCAN, in his official capacity as
Secretary of the United States Department of
Education,

                        Defendant.

----------------------------------------------------------------X

**14 CV 1230**

JUDGE SWEET

**CLASS ACTION
COMPLAINT**

RECEIVED
FEB 25 2014
U.S.D.C. S.D.N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1.    Named Plaintiffs Ana Salazar, Marilyn Mercado, Ana Bernardez and Jeannette Poole bring this class action on behalf of themselves and all other similarly situated individuals whose eligibility for federally guaranteed student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by the Wilfred American Education Corporation and/or schools owned or operated by the Wilfred American Education Corporation ("Wilfred").

2.    Wilfred, the parent company of a nationwide chain of beauty and secretarial schools, including Wilfred Academy of Hair and Beauty Culture ("Wilfred Academy"), American Business Institute ("ABI"), and the Washington School for Secretaries, ceased operations in the mid-1990s.

3.    Defendant Arne Duncan, in his official capacity as Secretary of the United States Department of Education ("Secretary" or "USED" or "the Department"), has known since at least 1982 that Wilfred engaged in widespread and systemic fraudulent behavior in connection

with the federally guaranteed loan program, including the routine certification of ineligible individuals for federal student loans, in violation of law and Department regulations.

4.      Given this widespread pattern of false certification and Wilfred's other fraudulent behavior, of which Defendant was aware, every loan disbursed to Wilfred is suspect.

5.      Plaintiffs allege that in light of Defendant's knowledge, Defendant acted and continues to act arbitrarily and capriciously and otherwise not in accordance with the Higher Education Act of 1965 and its Amendments, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), by actively enforcing Wilfred loan obligations without taking reasonable steps to ascertain which students' eligibility for loans was falsely certified, and by failing to discharge the loans of class members.

6.      Plaintiffs seek a declaration that Defendant has acted arbitrarily and capriciously in violation of the Administrative Procedure Act and in violation of his responsibilities under the Higher Education Act, and an injunction mandating that Defendant discharge the loans of all class members and provide all the attendant relief required by 20 U.S.C. § 1087(c).

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs Ana Salazar, Marilyn Mercado, and Ana Bernardez reside, and in which Defendant has his Regional office.

## PARTIES

9.      Plaintiff ANA SALAZAR lives at 547 West 157th Street, New York, New York. Ms. Salazar was certified for federal student loans to attend, and did attend, Wilfred Academy in 1988.

10.     Plaintiff MARILYN MERCADO lives at 1450 Clay Avenue, Bronx, New York. Ms. Mercado was certified for federal student loans to attend, and did attend, Wilfred Academy in 1987 and ABI in 1989.

11.     Plaintiff ANA BERNARDEZ lives at 1358 Washington Avenue, Bronx, New York.  Ms. Salazar was certified for federal student loans to attend, and did attend, Wilfred Academy in 1988.

12.     Plaintiff JEANETTE POOLE lives at 995 Gates Avenue, Brooklyn, New York. Although she never attended any Wilfred-operated school, Ms. Poole was certified for federal student loans to attend Wilfred Academy in 1987.

13.     Defendant ARNE DUNCAN is the Secretary of the United States Department of Education.  As such, he is responsible for administration of the federal student loan program, which includes the Federal Family Education Loan Program ("FFEL") and now also includes the Direct Consolidation Loan Program.

## STATUTORY AND REGULATORY FRAMEWORK

14.     The Higher Education Act of 1965 ("HEA") and its amendments authorize the Secretary of the Department of Education to administer a federal student financial aid program. 20 U.S.C. § 1071, *et seq.*

15.     All loans at issue in this Complaint were issued under the federal financial aid program known as the Federal Family Education Loan Program ("FFEL").  *See* 20 U.S.C. § 1071, *et seq.*; 34 C.F.R. Part 682.

16.     Under the FFEL program, lenders made loans for "eligible [student] borrowers" to attend "eligible" post-secondary institutions. 20 U.S.C. §§ 1077, 1091(a).

17.     FFEL loans were guaranteed by state and private guaranty agencies, and reinsured by the Department of Education.  20 U.S.C. § 1072.

18.     To be considered an "eligible institution," a school was required to be legally authorized to operate within its state and accredited by an accrediting agency recognized by the Secretary.  20 U.S.C. §§ 1099a(b), 1099b.

19.     In addition, the school was required to have entered into a Program Participation Agreement ("PPA") with the Secretary.  20 U.S.C. § 1094.

20.     The PPA conditioned the institution's "initial and continued participation" in the federal student aid program upon the school's compliance with federal law and regulation and all other conditions specified in the PPA.  20 U.S.C. § 1094; 34 CFR § 668.14(a)(1).

21.     At all times relevant to this Complaint, the Secretary had the authority to limit, suspend, or terminate an eligible institution's participation in the federal student aid program if and when the Secretary determined that such institution had violated the PPA and/or statutes and regulations governing the program.  20 U.S.C. § 1094(c)(1)(F).

22.     Until 1986, only individuals possessing a high school diploma or its recognized equivalent ("GED") were eligible for federal student aid.  *See* Pub. L. 89-329 §§ 435 (codified as amended at 20 U.S.C. § 1085), and 801 (codified as amended at 20 U.S.C. § 1133).

23.     In 1986, Congress modified the borrower eligibility criteria to allow individuals who did not have a high school diploma or GED to be eligible for loans if the institution determined that the student demonstrated the "ability to benefit" ("ATB") from the specific program he or she sought to attend.  Pub. L. 99-498, § 407(a) (codified as amended at 20 U.S.C. §§ 1088, 1091(d)).

24.     A school could establish a borrower's eligibility under the ATB exception by certifying that it had administered an approved ATB test to the student and that the student had received a passing score.  20 U.S.C. § 1091(d); 34 C.F.R. § 668.32(e).

25.     In 1992, Congress provided that students whose eligibility was falsely certified by an institution would be eligible to have their federally guaranteed student loans discharged. Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (codified as amended at 20 U.S.C. § 1087); 34 C.F.R. § 682.402(e)(1), (13).

26.     This provision, which applies to loans disbursed in whole or in part on or after January 1, 1986, requires that "the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan." 20 U.S.C. § 1087(c)(1).

27.     The discharge is available to borrowers in instances in which an institution falsely certified an individual's eligibility for a loan by, among other things: certifying that a student had a high school diploma or GED when he or she did not; certifying that the student was eligible under the ATB exception when he or she was not; and/or obtaining loans without a student's authorization.  34 C.F.R. § 682.402(e)(1); 34 C.F.R. § 685.215(a)(1).

28.     Department regulations set forth the procedures by which a borrower can submit an application for a false certification discharge. 34 C.F.R. § 682.402(e)(3), 34 C.F.R. § 685.215(c).

29.     In evaluating a borrower's request for a discharge, the Department or guaranty agency, if any, must consider the request "in light of information available from the records of the agency and from other sources, including other guaranty agencies, state authorities, and cognizant accrediting associations." 34 C.F.R. § 682.402(e)(6)(iv); 34 C.F.R. § 685.215(d)(3).

30.     As soon as the Department or a guaranty agency has reliable information indicating that a borrower might be eligible for a discharge, it is required to suspend all efforts to collect from the borrower and to notify the borrower of the procedures for requesting a discharge. 34 C.F.R. § 682.402(e)(6)(ii); 34 C.F.R.§ 685.215(d)(1).

31.     The Secretary may discharge a borrower's loans absent an application from the borrower if he determines that the borrower qualifies for a discharge based on information in his or the guaranty agency's possession. 34 C.F.R. § 682.402(e)(15); 34 C.F.R. § 685.215(c)(7).

32.     There is no time limit on a student's eligibility for a false certification discharge. 34 C.F.R. § 682.402(e)(6)(v).

33.     Discharge of a student loan entitles the borrower to: (i) relief from any existing or past obligation to repay the loan and associated costs or charges; (ii) the restoration of the borrower's eligibility to receive federal assistance under the HEA; (iii) reimbursement of amounts paid voluntarily or through enforced collection; and (iv) correction of all adverse credit reports by reporting to all credit reporting agencies to which the holder previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan.  20 U.S.C. §1087(c); 34 C.F.R. § 682.402(e); 34 C.F.R. § 685.215(b).

34.     A loan originated under the FFEL program that is later consolidated under the Direct Consolidated Student Loan program is eligible for false certification discharge if the student's eligibility for the original FFEL loan was falsely certified.   *See* 34 C.F.R. § 685.212.

35.     Although the Secretary generally must seek collection of all federally guaranteed student loans, he is authorized to compromise claims and cease collection efforts at his discretion in certain circumstances. *See* 31 U.S.C. § 3711(a)(3).

36.     The Administrative Procedure Act ("APA") provides that any individual "adversely affected or aggrieved by agency action . . . is entitled to judicial review."  5 U.S.C. § 702.

37.     The APA specifically authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

38.     The APA also creates a cause of action to "hold unlawful and set aside agency action, findings, and conclusions found to be—in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and a proposed class of:

> All individuals whose eligibility for federally guaranteed student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by the Wilfred American Education Corporation and/or schools owned or operated by the Wilfred American Education Corporation ("Wilfred").

40.     The proposed class is so numerous that joinder of all members is impracticable. Upon information and belief, there are many thousands of individuals who are similarly situated to the Named Plaintiffs.

41.     There are questions of fact common to members of the class including: (i) the extent of information Defendant had and currently has in his possession about Wilfred's widespread fraudulent behavior and its false certification of borrowers' eligibility for federally guaranteed student loans, and (ii) what steps, if any, have been taken by Defendant to identify borrowers eligible for false certification discharges and inform them of such eligibility.

42.     There are questions of law common to members of the class including whether Defendant, who was aware of Wilfred's consistent pattern of gross violations of law and regulations in multiple programs over multiple years, acted and continues to act arbitrarily and capriciously, in violation of Sections 706(2)(A) and (C) of the Administrative Procedure Act, by (i) actively enforcing all Wilfred loan obligations without taking reasonable steps to ascertain which students' eligibility for loans was falsely certified, and (ii) failing to discharge the loans that Defendant knows, based on reliable or easily ascertained information, are eligible for discharge.

43.     The claims of the Named Plaintiffs are typical of the claims of all members of the proposed class.  The Named Plaintiffs, like all members of the class, had their eligibility for federally guaranteed student loans falsely certified by Wilfred. The Named Plaintiffs, like all class members, have made payments, been subject to the imposition of involuntary collection activity, interest, and penalties, have had their credit affected, and/or have been unable to attend other schools or obtain other loans because their eligibility for Wilfred loans had been falsely certified and because of Defendant's continued enforcement of Wilfred loan obligations.

44.     The Named Plaintiffs will adequately and fairly protect the interests of all members of the class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any members of the class.

45.     Plaintiffs are represented by the New York Legal Assistance Group, whose attorneys are experienced in class action litigation, including litigation to enforce the rights of consumers, and particularly the rights of individuals with guaranteed student loan debts.

46.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to the practices at issue in this action.  Separate actions would be, as a practical matter, dispositive of the interests of other individual members of the class and would substantially impair their abilities to protect their interests.  Defendants have acted on grounds generally applicable to the class, thereby making a class action superior to other available methods for the fair and efficient adjudication of this controversy.

47.     Moreover, it would be impracticable for potential plaintiffs, who are primarily low-income individuals with limited access to counsel, to obtain legal services on an individual basis for their claims.  Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

48.     Wilfred, initially opened as a small chain of beauty schools, expanded rapidly after amendments to the HEA made federal student aid dollars available to students of for-profit trade schools.

49.     Between the 1970s and 1988, Wilfred grew from 39 to 58 schools.

50.     In 1988, Wilfred had an enrollment of over 11,000 students nationwide.

51.     Wilfred would not have been able to remain in business and grow without the money it received from the federal student aid program.

52.     Between 1980 and 1989, Wilfred drew at least $405 million in loans and grants under the federal student aid program.

53.     In the 1980s, between 80 and 90 percent of Wilfred's revenue was derived from the federal student aid program.

54.     In 1984, Wilfred went public and in 1985, Wilfred's annual revenues reached approximately $75 million.

55.     Wilfred targeted and recruited immigrants and economically disadvantaged individuals for enrollment in its schools.

56.     Wilfred was responsible for certifying that each borrower met the requisite eligibility criteria for financial aid.

57.     Wilfred routinely certified students as eligible for federally guaranteed student loans even though the students were not eligible.

58.     On information and belief, the majority of federally guaranteed student loans disbursed to Wilfred were disbursed based on false certifications of eligibility.

59.     Wilfred routinely falsely certified students as eligible for federally guaranteed student loans even though the certified students did not have a high school diploma or GED, and Wilfred did not give them ability to benefit ("ATB") tests.

60.     Wilfred either certified that these students did in fact have a high school diploma or GED when they did not, or certified that the students took and passed an approved ATB test when they had not.

61.     Wilfred administered non-approved ATB tests or ATB tests that were not in a language that the prospective student could read or write.

62.      Wilfred gave inappropriate assistance to prospective students on the tests, including by changing incorrect answers and by filling in answers for the students.

63.      Wilfred routinely falsely certified the eligibility of individuals for loans, and received proceeds from such loans, when the individual did not enroll in or attend any Wilfred school.

64.      Members of the class have suffered harm as a result of these falsely certified loans.

65.      Members of the class have paid money toward an invalid debt.

66.      Members of the class have incurred interest and penalties and collection fees on their student loans that have vastly increased their original debts.

67.      Members of the class have had their federal income tax refunds seized and their wages garnished because of student loans attributable to Wilfred.

68.      Members of the class have had their credit damaged as a result of their Wilfred loans.

69.      Members of the class have consolidated their Wilfred loans under the Direct Consolidated Student Loan Program.

70.      Defendant was and continues to be aware that Wilfred routinely falsely certified eligibility for federally guaranteed student loans.

71.      By the early 1980s, Defendant knew of Wilfred's pattern of violating statutory and regulatory requirements of the student financial aid program as well as the terms of Wilfred's Program Participation Agreement ("PPA") with USED.

72.    In 1982, USED found five Wilfred schools (three in New York and two in Illinois) ineligible for continued participation in the federally guaranteed loan program because borrowers from those locations defaulted on their student loans at an unacceptable rate.

73.    In 1983, USED's Office of the Inspector General ("OIG") began investigating Wilfred schools in Massachusetts for evidence of improper practices regarding its participation in the federally guaranteed student loan program.

74.    In 1985, the OIG began investigating Wilfred schools in Florida.

75.    In 1986, the OIG commenced an in-depth national investigation of Wilfred.

76.    The Department of Education learned that Wilfred had a practice of, among other things, recruiting students who were ineligible for financial aid and then providing false information to USED in order to obtain grants and loans under federal student aid programs.

77.    The Department determined that Wilfred's fraudulent actions were not attributable to low-level rogue employees, but were the result of widespread practices and policies that originated with or were condoned by Wilfred corporate management.

78.    The Department cooperated with the United States Department of Justice in a joint federal task force convened to investigate Wilfred principals and employees.

79.    In October of 1986, the Department of Justice won an indictment from a federal grand jury in Massachusetts against seven former admissions representatives at two Wilfred schools on charges of aiding, abetting, and inducing students to submit false applications for federal grants.

80.    The indictment alleged that Wilfred sales representatives targeted "young, unlearned and disadvantaged" individuals and that sales representatives falsely told students they could attend using "free money" from the government.

81.     The indictment alleged that the fraud and misrepresentation about federal financial aid resulted from the company's quota system, which required admissions representatives to enroll a specific number of students in a given time period or lose their jobs.

82.     Additional charges were later brought against the managers of the Massachusetts schools and Wilfred itself.

83.     In 1988, the Department of Justice won an indictment from a grand jury in the Middle District of Florida against Wilfred, its president, Philip E. Jakeway, and 18 Wilfred employees for violations of various laws in connection with Wilfred's administration of student financial aid.

84.     The indictment charged Wilfred principals and employees with conspiring to defraud the Department, with 28 counts of making false statements before the Education Department, with 27 counts of stealing, embezzling, or misapplying funds provided or insured by the Education Department, with eight counts of wire fraud, and with one count of racketeering under RICO.

85.     The indictment cited 64 specific instances of financial aid fraud and false certification by Wilfred.

86.     Wilfred employees admitted to falsifying applications for financial aid.

87.     Former employees at Wilfred's Florida locations also admitted to enrolling students who could not read.

88.     Teenagers unfamiliar with filing forms were told by Wilfred employees to sign blank applications, and false information was added later to obtain government aid.

89.     In December 1988, the Department attempted to terminate 58 Wilfred schools from the federally guaranteed loan program because of the federal indictment.  Wilfred successfully defeated this attempt on procedural grounds.

90.     The Department subsequently placed Wilfred on "reimbursement status" in the federal student aid program, meaning that Wilfred could no longer draw money for its students in advance, and could only be reimbursed by the Department after submitting proper documentation.

91.     In 1991, the United States District Court in Massachusetts ruled that Wilfred submitted false applications for financial aid, fined Wilfred over $500,000 and convicted employees on nine counts of mail fraud.

92.     Also in 1991, Wilfred was convicted in the United States District Court for the Middle District of Florida of defrauding the federal government of millions of dollars of student aid.

93.     The Department was aware that Wilfred continued to certify students as eligible for loans and to operate with federal student aid, despite the criminal convictions and numerous allegations of fraud, and despite having filed for protection under Chapter 11 of the Bankruptcy Code in May 1990.

94.     The last Wilfred school ceased operation in 1994.

95.     Because of rampant abuse in the federal student aid program, such as that perpetrated by Wilfred, in the early 1990s the Senate conducted an investigation of the program and found "one of the most widely abused areas of trade school practices was admissions and recruitment, in particular the admission of students who had not finished high school under the

so-called 'ability-to-benefit' or 'ATB' rule." *Abuses in Federal Student Aid Programs*, S. Rep. No. 102-58, 12, 32 (1991) (hereinafter "Nunn Report").

96.    The Senate concluded that USED "has effectively abdicated its [federal student loan program] oversight responsibilities to private accrediting bodies, State licensing authorities, and guaranty agencies.  Experience has proven that those bodies have neither the motivation nor the capabilities to effectively police the program."  Nunn Report at 32.

97.    Congress thereafter created the false certification discharge.

98.    Absent this provision, students whose eligibility for student loans was falsely certified had little if any recourse.  Federal student loans are rarely dischargeable in bankruptcy and are not subject to a statute of limitations on collection.

99.    After a long investigation, on June 19, 1996, Defendant's OIG made a finding, titled "Documentation of ATB violations," covering approximately 50 Wilfred schools.

100.    Defendant found that Wilfred engaged in a "[c]onsistent pattern of gross violations of DOE regulations in multiple programs over multiple years indicates a strong resistance to following DOE regulations for administering funds and ATB student testing. Violations appeared system wide."

101.    In this June 1996 document, the Defendant noted that "[s]ystemic violations [were] found in multiple reports. A Federal Grand Jury indicted the CEO of Wilfred American Educational Corporation plus 18 past and present employees for fraud and falsifying information on applicants and applications."

102.    Defendant concluded that, "[s]ince the corporation was cited as early as June 1984 for improper grading practices, it is recommended that all ATB applications be discharged."

103.    Upon information and belief, Defendant has granted the discharge applications of all Wilfred students who have submitted applications demonstrating the basic eligibility requirements for a false certification discharge.

104.    Upon information and belief, the majority of class members were, and continue to be, unaware of the availability of a false certification discharge.

105.    Despite the issuance of the 1996 report and Defendant's knowledge of Wilfred's fraudulent activity and pattern of falsely certifying students' loan eligibility, the Department has not taken steps to identify which individuals' eligibility was falsely certified and therefore which individuals should be granted false certification discharges.

106.    Upon information and belief, Defendant has or could have had information in his possession demonstrating that, as a result of past investigations, specific class members are eligible for false certification discharges and he did not grant such discharges.

107.    Despite having knowledge of Wilfred's bad practices, and despite the findings and recommendations of the OIG, Defendant has continued to collect on student loans disbursed to Wilfred schools.

108.    Despite having knowledge that the loans of Wilfred class members were falsely certified and despite the findings and recommendations of the OIG, Defendant continues to collect and failed to discharge the loans of those individuals about whom Defendant has information indicating eligibility for discharge.

<u>NAMED PLAINTIFFS FACTUAL ALLEGATIONS</u>

*Ana Salazar*

109.    Ana Salazar is 65 years old. She was born in the Dominican Republic, where she attended school through the eighth grade.

110.    In the early 1980s, after she had settled in the United States, Ms. Salazar worked in various jobs to earn enough money to care for her children; she worked at a factory packing books, at a garment factory putting size tags on clothes, and for two to three years as a security guard for Wells Fargo bank.

111.    She was unsatisfied with these jobs because they did not pay well and were seasonal or temporary.

112.    In 1988, Ms. Salazar saw advertisements for Wilfred Academy on a Spanish television channel.  The advertisements caught her eye because they portrayed Wilfred Academy as the "best" beauty school and promised that one could obtain a diploma in a short amount of time.

113.    Ms. Salazar was attracted by the promise in the advertisement that graduates of Wilfred Academy would get jobs after completion of the short program.

114.    Ms. Salazar therefore went to a Wilfred Academy located on 50th Street and Broadway in Manhattan to inquire about the program.

115.    That day she met with a representative of Wilfred Academy, was given a tour of the school, and was told about the benefits of the beauty program.

116.    Ms. Salazar did not speak English at the time she met with the representative of Wilfred Academy.  The representative spoke to her in Spanish and explained why Wilfred Academy was not just a good choice, but the best choice for a training program.

117.    He promised her "the land and the skies," and said that when she finished with her program, Wilfred Academy would help her find a job, and then one day she would be able to open her own salon.

118.    A representative of Wilfred Academy asked Ms. Salazar for her basic information (name, social security number and address) and then filled out some forms and asked her to sign. The forms were all in English so she did not understand them and could not read them on her own.

119.    Ms. Salazar did not then and still does not have a high school diploma or GED.

120.    She was never asked by a Wilfred representative whether she had a high school diploma or GED.

121.    Ms. Salazar was not given any test before she was certified as eligible for a guaranteed student loan.

122.    Ms. Salazar was disappointed with the quality of the Wilfred program and felt that she did not learn anything but was determined to finish the program.

123.    About six months into the program, Ms. Salazar was not well and needed to take a short break because of her medical problems.

124.    She called Wilfred Academy and told them that she needed two weeks off to deal with her medical issues.  The school told her that was no problem and that she should come back to school when she was ready.  The school also told her that they would help her to catch up on what she missed when she was feeling better and back in school.

125.    Relying on these assurances, Ms. Salazar took two weeks off with the intention of returning to finish the program when she was better.

126.    Approximately two weeks later, Ms. Salazar returned to Wilfred Academy to finish the program.  The school was closed.

127.    Ms. Salazar called the school and returned to the school multiple times but the school remained closed and she could not finish the program.

128.    Two loans were disbursed to Wilfred Academy for Ms. Salazar, both on November 2, 1988, one in the amount of $4,000, and the other in the amount of $2,625.

129.    In the early 1990s, Ms. Salazar wanted to get an office job.  She applied to a school in downtown Manhattan offering training for office assistants.  The school determined that she was in default on her Wilfred Academy loans and therefore she would not be able to take out another loan.

130.    In 1993, Ms. Salazar enrolled in a free training program to learn to be a health care and child care worker.  She eventually found a job as a child care provider and worked for 13 years before retiring.

131.    Throughout the 13 years that Ms. Salazar worked as a child care provider, she paid between $80 and $100 per month (depending on her income) toward her Wilfred debt, pursuant to a payment plan she arranged with collectors of the debt.

132.    Ms. Salazar struggled enormously to cover the expenses of rent, utilities and food for herself and her four children, in addition to these monthly payments for her Wilfred debt.

133.    At the direction of Defendant, the IRS has seized her federal income tax refunds approximately five times, in service of her debt from Wilfred.

134.    Despite having paid, voluntarily and involuntarily, over $7,000 towards her student loan debt, she still owes an outstanding principal balance of $10,131 and $6,241 in outstanding interest.

135.    Ms. Salazar cannot afford to make payments towards this debt.  She now lives on Social Security retirement and SSI benefits, and supplements this with food stamps.

136.    The only communications that Ms. Salazar has received from the Defendant were attempts to collect her loans; she never received any communication from the Department informing her of the availability of a false certification discharge.

137.    Ms. Salazar only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

*Marilyn Mercado*

138.    Marilyn Mercado was born in Brooklyn, New York.

139.    Ms. Mercado dropped out of school during junior high school.

140.    A few years later, a friend of hers told her about Wilfred Academy.  In 1987, Ms. Mercado went to a Wilfred Academy located at Broadway and 50th Street in Manhattan to sign up for classes.

141.    Ms. Mercado met with a representative of Wilfred Academy who enrolled her in the beauty program.

142.    The representative promised Ms. Mercado that Wilfred Academy would help her to find a job in a salon after finishing the program.

143.    Ms. Mercado was only 17 years old when she signed up for Wilfred Academy and she does not remember very much about the application process.

144.    She understood that she was taking out a loan but also believed that either her friend, who had suggested she go to Wilfred Academy and hoped to open her own salon, or Wilfred Academy would help her get a job so that she would easily be able to pay back the loan.

145.    Ms. Mercado had no high school diploma or GED when she enrolled in Wilfred Academy, and she was not asked by Wilfred Academy whether she had a high school diploma or GED.

146.    She was not given any test before Wilfred Academy certified her eligibility for student loans.

147.    Ms. Mercado completed the program at Wilfred Academy and received a certificate from the school.

148.    Ms. Mercado did not learn anything useful at Wilfred Academy, not even how to cut hair.

149.    Ms. Mercado sought assistance from Wilfred Academy in finding a job, because her friend did not open her salon as planned.

150.    Wilfred Academy did not assist Ms. Mercado in finding a job.

151.    Ms. Mercado found a job on her own working in a salon but she only worked there for a few days.  She was hired to cut hair, but the owner of the salon limited her to washing hair because she did not actually know how to cut hair.

152.    Ms. Mercado took some practice cosmetology license tests while at Wilfred Academy but failed all of them.

153.    Some of Ms. Mercado's friends who went to Wilfred Academy took the licensing test and they told her that the test was very hard; almost all of them failed.

154.    Ms. Mercado never attempted the test to get her license.

155.    After leaving Wilfred Academy, Ms. Mercado decided to pursue a job working with computers.

156.   A friend told her about American Business Institute ("ABI"), on Grand Concourse in the Bronx, near where she lived at the time.

157.   Ms. Mercado enrolled in ABI. At the time, she had no high school diploma or GED, nor was she asked if she had a high school diploma or GED or given any test before being certified as eligible for federally guaranteed student loans.

158.   Ms. Mercado never finished the program at ABI; she found the course material very difficult and the instruction poor; she often failed the tests that were given.

159.   Three loans were disbursed to Wilfred schools for Ms. Mercado: in April of 1987, a loan for $3,150 was disbursed to Wilfred Academy, and in May of 1989, two loans were disbursed to ABI in the amounts of $2,625 and $2,800.

160.   In the years after she went to ABI, Ms. Mercado had several low-paying jobs and experienced periods of un- or under-employment.

161.   Over the years, she has made payments on her student loans when she was able.

162.   Ms. Mercado ultimately defaulted on her student loans because she was unable to pay.

163.   She currently works for the New York City Board of Education as a school bus attendant and is training to be a school bus driver.

164.   At the direction of Defendant, the IRS seized Ms. Mercado's 2012 federal income tax refund, which was just under $8,000, in service of her student loan debt.

165.   Despite the many voluntary and involuntary payments she has made toward her student loans, Ms. Mercado still owes a total of $8,231 in outstanding principal and $6,679 in outstanding interest for all three loans combined.

166.   Her student loan debt and default have impaired her credit to the point where she is unable to obtain an extension of credit.

167.   Ms. Mercado learned only recently from Plaintiffs' attorneys of the existence of the false certification discharge and that she is eligible for such a discharge.

168.   The only communications she has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

*Ana Bernardez*

169.   Ana Bernardez is 57 years old. She was born in Honduras and moved to the Bronx when she was 11 years-old.

170.   Ms. Bernardez dropped out of high school when she was 17.

171.   After working intermittently in factory jobs, Ms. Bernardez saw multiple advertisements on television for Wilfred Academy, which showed happy women working in salons and promised future graduates a certificate and a job immediately after graduation.

172.   Thereafter, Ms. Bernardez met with a representative of a Wilfred Academy located on Fordham Road.

173.   The representative told Ms. Bernardez that if she enrolled in Wilfred Academy, she would learn how to cut and style hair and that she could even make money while enrolled in school.

174.   He told her that Wilfred Academy would help to find her a job while she was still in school, and that that after graduation she could own her own beauty salon business.

175.   He told her that she could enroll at once, and start classes the following Monday.

176.    He told her that the only requirement for enrollment was a social security number, which Ms. Bernardez provided to him, and she enrolled.

177.    At the time she enrolled in Wilfred Academy, Ms. Bernardez did not have a high school diploma or GED, nor was she asked whether she had a high school diploma or GED.

178.    Ms. Bernardez was not given any test before she was certified as eligible for a guaranteed student loan.

179.    The Wilfred Academy representative told Ms. Bernardez that the program would cost only a few hundred dollars.  She was not told that she had been certified as eligible for federally guaranteed loans and that she would have to pay back thousands of dollars for the program.

180.    Ms. Bernardez took classes at night, after working during the day.  She attended Wilfred Academy for less than two weeks and dropped out because she felt that the program was so bad that it would not lead to employment.

181.    Two federal student loans were disbursed on August 9, 1988 to Wilfred Academy for Ms. Bernardez, the first in the amount of $2,625 and the second in the amount of $4,000.

182.    Because Ms. Bernardez did not understand that she had taken out loans to attend Wilfred, she assumed that she did not owe any money for the less than two weeks she had attended Wilfred Academy.

183.    Years later, Ms. Bernardez went to buy furniture and tried to get a loan to cover some of the cost.  She was told that she could not get the loan because she had a bad credit score but she did not understand why.

184.    In the late 1990s, she learned of her student loan debt when she consulted a lawyer about her debt problems.

185.   Ms. Bernardez believes that signing up for Wilfred Academy in 1988 was the biggest mistake she made in her life.

186.   Bad credit has haunted Ms. Bernardez and her family for years as a result of the Wilfred debt.

187.   In 2013, Ms. Bernardez's daughter, Nancy Martinez, asked her mother to co-sign a loan for her, but Ms. Bernardez could not because of her bad credit.

188.   Ms. Bernardez has had her federal income tax refunds seized by the IRS approximately five times at the direction of Defendant, because of her student loans.  The intercepted refunds ranged from $500 to as much as $4,000.

189.   Despite the payments she has made toward her student loans over the years, she still owes $20,462 on the loan principal and $2,323 in interest.  Ms. Bernardez's loans are currently in forbearance because she cannot afford to pay them.

190.   Ms. Bernardez worked as a home attendant for many years until 2004 when she stopped because of health problems.  She has had multiple operations because of brain tumors discovered in 2009 and ultimately found to be cancerous.  She is also diabetic and has heart problems and a bad knee.

191.   She now collects Social Security Disability benefits and Food Stamps.

192.   The only communications that Ms. Bernardez has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

193.   Ms. Bernardez only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

*Jeannette Poole*

194.   Jeanette Poole is 50 years old.

195.   She was born in Bedford-Stuyvesant, Brooklyn.

196.   She dropped out of school when she was 18 years old and never finished high school or obtained a GED.  She was homeless at the time and found it difficult to attend school.

197.   In 1987, a friend suggested to Ms. Poole that she consider attending Wilfred Academy so that she could get a job in a hair salon.

198.   Subsequently, Ms. Poole passed by a Wilfred Academy on Fulton Street and decided to go in to find out about the school.  She met with a representative of Wilfred Academy.

199.   The representative promised that Wilfred Academy would help Ms. Poole find a job after completing the program. The representative asked for Ms. Poole's name, social security number and date of birth so that she could see if Ms. Poole qualified for loans to cover the cost of the program.

200.   The representative told Ms. Poole that she qualified for a student loan.

201.   At that time, Ms. Poole decided not to enroll or seek a student loan.  She was homeless, sleeping in an abandoned building, and did not think she was in a position to take on a loan.

202.   Ms. Poole explained to the Wilfred representative that she had just wanted information and that she did not want to sign up for the program.

203.   Ms. Poole left Wilfred that day and never went back.

204.   Nonetheless, entirely without Ms. Poole's knowledge, on July 9, 1987, two loans were disbursed to Wilfred Academy for Ms. Poole in the amounts of $2,625 and $2,925.

205.    Ms. Poole had no idea, until she was contacted by a bank attempting to collect, that a student loan had been taken out in her name.

206.    Ms. Pool did not believe that she had any obligation to pay for this unauthorized loan. The loan went into default.

207.    In approximately 1999, Ms. Poole applied for a business training program at Lenore Community College in Kinston, North Carolina to learn to start a business. She learned that, because she was in default on loans to Wilfred, she was not eligible for any federally guaranteed student loans. She enrolled in a few free programs, but was unable to take the full business course because it was too expensive and she could not obtain financial aid.

208.    Ms. Poole attempted multiple times to obtain an extension of credit for a variety of reasons, including for necessary repairs to living quarters that were damaged by a flood. Each time, she was denied an extension of credit because of her defaulted Wilfred loan.

209.    On at least one occasion, at the direction of Defendant, the IRS has seized Ms. Poole's federal income tax refund, in service of her Wilfred loan.

210.    Ms. Poole has made efforts for years to contest the Wilfred loan. She attempted on multiple occasions to dispute the obligation to the IRS and USED, but to no avail.

211.    The only communications that Ms. Poole has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

212.    Despite never having attended Wilfred Academy, Ms. Poole still owes money on defaulted Wilfred loans. The outstanding principal on the loans is $5,820 and the interest is $2,781.

## FIRST CLAIM FOR RELIEF

Defendant acted and continues to act arbitrarily and capriciously, and otherwise not in accordance with the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), by actively enforcing all Wilfred loan obligations even though he had and has knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans.

## SECOND CLAIM FOR RELIEF

Defendant acted and continues to act arbitrarily and capriciously, and otherwise not in accordance with the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), by failing to take reasonable steps, in light of his knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans, to ascertain which loans were falsely certified.

## THIRD CLAIM FOR RELIEF

Defendant acted and continues to act arbitrarily and capriciously, and otherwise not in accordance with the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), by failing to discharge the loans of class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

1.     Certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, with the class consisting of all individuals whose eligibility for federally guaranteed student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by Wilfred.

2.   Declaring that:

     a.     Defendant's active enforcement of all Wilfred loan obligations even though he has knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with Defendant's responsibilities under the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C); and

     b.     Defendant's failure to take reasonable steps, in light of his knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans, to ascertain which individuals' eligibility for loans was falsely certified is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with Defendant's responsibilities under the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C); and,

     c.     Defendant's failure to discharge the loans of class members is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with Defendant's responsibilities under the Higher Education Act, 20 U.S.C. § 1071, *et seq.*, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

3.   Enjoining Defendant to:

     a.     Immediately suspend collection on all federally guaranteed student loans disbursed to Wilfred in whole or in part on or after January 1,

1986;

      b.    Immediately discharge the loans of all class members about whom he has information that the individual is eligible for a false certification discharge; take all steps required by 20 U.S.C. § 1087(c) to provide full relief to those class members; and inform them of the discharge;

      c.    After a process agreed upon the parties to identify class members, discharge the loans of class members; take all steps required by 20 U.S.C. § 1087(c) to provide them full relief; and inform them of the discharge.

4.    Ordering Defendant to pay the cost of this action, together with reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(l)(A), as determined by the Court; and

5.    Granting such other and further relief as the Court may deem just and proper.


Dated:      February 25, 2014
          New York, New York

By: _____

Respectfully submitted,

YISROEL SCHULMAN, ESQ
New York Legal Assistance Group
Jane Greengold Stevens, of counsel
Jennifer Magida, of counsel
Eileen Connor, of counsel
7 Hanover Square, 7th Fl.
New York, NY 10004
Phone: 212-613-5000
Fax:    212-714-7461