UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANA SALAZAR, MARILYN MERCADO, ANA
BERNARDEZ, JEANNETTE POOLE, EDNA
VILLATORO, LISA BRYANT and CHERRYLINE
STEVENS, on behalf of themselves and all others              14 CIV 1230 (RWS)
similarly situated,

                                    Plaintiffs,              **AMENDED CLASS ACTION**
                                                                 **COMPLAINT**

                 -against-

ARNE DUNCAN, in his official capacity as
Secretary of the United States Department of
Education,

                                    Defendant.
----------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.      Named Plaintiffs Ana Salazar, Marilyn Mercado, Ana Bernardez, Jeannette Poole,

Edna Villatoro, Lisa Bryant and Cherryline Stevens bring this class action on behalf of

themselves and all other similarly situated individuals whose eligibility for federally guaranteed

student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by

the Wilfred American Education Corporation and/or schools owned or operated by the Wilfred

American Education Corporation ("Wilfred").

2.      Wilfred, the parent company of a nationwide chain of beauty and secretarial

schools, including Wilfred Academy of Hair and Beauty Culture ("Wilfred Academy"),

American Business Institute ("ABI"), and the Washington School for Secretaries, ceased

operations in the mid-1990s.

3.      Defendant Arne Duncan, in his official capacity as Secretary of the United States

Department of Education ("Secretary" or "USED" or "the Department"), has known since at

least 1982 that Wilfred engaged in widespread and systemic fraudulent behavior in connection with the federally guaranteed student loan program, including the routine certification of ineligible individuals for federal student loans, in violation of law and Department regulations.

4.    Given this widespread pattern of false certification and Wilfred's other fraudulent behavior, of which Defendant was aware, every loan disbursed to Wilfred is suspect.

5.    Plaintiffs allege that in light of Defendant's knowledge, Defendant acted and continues to act arbitrarily and capriciously and otherwise not in accordance with the Higher Education Act of 1965 and its Amendments, 20 U.S.C. § 1071, *et seq.* and its implementing regulations, and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1) and 706(2)(A) and (C), by failing and refusing to take reasonable steps to determine whether students' eligibility for federally guaranteed loans to attend Wilfred was falsely certified, by actively enforcing Wilfred loan obligations without taking such steps, and by failing to discharge the loans of class members.

6.    Plaintiffs seek a declaration that Defendant has acted arbitrarily and capriciously, in violation of the Administrative Procedure Act and in violation of his responsibilities under the Higher Education Act, and an injunction mandating that Defendant suspend collection on all Wilfred loans, take reasonable steps to identify all individuals who had their eligibility for federally guaranteed student loans falsely certified by Wilfred, discharge the Wilfred loans of all eligible borrowers, and provide all the attendant relief required by 20 U.S.C. § 1087(c).

### JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

8.      Venue is proper in the Southern District of New York pursuant to

28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs Ana Salazar, Marilyn

Mercado, and Ana Bernardez reside, and in which Defendant has his Regional office.

## PARTIES

9.      Plaintiff ANA SALAZAR lives at 547 West 157th Street, New York, New York.

Ms. Salazar was certified for federal student loans to attend, and did attend, Wilfred Academy in

1988.

10.      Plaintiff MARILYN MERCADO lives at 1450 Clay Avenue, Bronx, New York.

Ms. Mercado was certified for federal student loans to attend, and did attend, Wilfred Academy

in 1987 and ABI in 1989.

11.      Plaintiff ANA BERNARDEZ lives at 1358 Washington Avenue, Bronx, New

York.  Ms. Salazar was certified for federal student loans to attend, and did attend, Wilfred

Academy in 1988.

12.      Plaintiff JEANETTE POOLE lives at 995 Gates Avenue, Brooklyn, New York.

Although she never attended any Wilfred school, Ms. Poole was certified for federal student

loans to attend Wilfred Academy in 1987.

13.      Plaintiff EDNA VILLATORO lives at 256 Parker Street, Newark, New Jersey.

Ms. Villatoro was certified for federal student loans to attend, and did attend, Wilfred Academy

in 1987.

14.      Plaintiff LISA BRYANT lives at 8300 West Airport Boulevard, Houston, Texas.

Ms. Bryant was certified for federal loans to attend, and did attend, Wilfred Academy in 1987.

15.    Plaintiff CHERRYLINE STEVENS lives at 140-13 172nd Street, Jamaica, New York.  Ms. Stevens was certified for federal loans to attend, and did attend, Wilfred Academy in 1989.

16.    Defendant ARNE DUNCAN is the Secretary of the United States Department of Education.  As such, he is responsible for administration of the federal student loan program, which includes the Federal Family Education Loan Program ("FFEL") and now also includes the Direct Consolidation Loan Program.

## STATUTORY AND REGULATORY FRAMEWORK

17.    The Higher Education Act of 1965 ("HEA") and its amendments authorize the federal student financial aid program. 20 U.S.C. § 1071, *et seq.*

18.    The HEA requires the Secretary to "carry out programs to achieve the purposes" of the federal student financial aid program.  20 U.S.C. § 1070(b).

19.    All loans at issue in this Complaint were issued under the federal financial aid program known as the Federal Family Education Loan Program ("FFEL").  *See* 20 U.S.C. § 1071, *et seq.*; 34 C.F.R. Part 682.

20.    Under the FFEL program, lenders made loans for "eligible [student] borrowers" to attend "eligible" post-secondary institutions. 20 U.S.C. §§ 1077, 1091(a).

21.    FFEL loans were guaranteed by state and private guaranty agencies, and reinsured by the Department of Education.  20 U.S.C. § 1072.

22.    To be considered an "eligible institution," a school was required to be legally authorized to operate within its state and accredited by an accrediting agency recognized by the Secretary.  20 U.S.C. §§ 1099a(b), 1099b.

23.    In addition, the school was required to have entered into a Program Participation Agreement ("PPA") with the Secretary.  20 U.S.C. § 1094.

24.    The PPA conditioned the institution's "initial and continued participation" in the federal student aid program upon the school's compliance with federal law and regulation and all other conditions specified in the PPA.  20 U.S.C. § 1094; 34 CFR § 668.14(a)(1).

25.    At all times relevant to this Complaint, the Secretary had the authority to limit, suspend, or terminate an eligible institution's participation in the federal student aid program if and when the Secretary determined that such institution had violated the PPA and/or statutes and regulations governing the program.  20 U.S.C. § 1094(c)(1)(F).

26.    Until 1986, only individuals possessing a high school diploma or its recognized equivalent ("GED") were eligible for federal student aid.  *See* Pub. L. 89-329 §§ 435 (codified as amended at 20 U.S.C. § 1085), and 801 (codified as amended at 20 U.S.C. § 1133).

27.    In 1986, Congress modified the borrower eligibility criteria to allow individuals who did not have a high school diploma or GED to be eligible for loans if the institution determined that the student demonstrated the "ability to benefit" ("ATB") from the specific program he or she sought to attend.  Pub. L. 99-498, § 407(a) (codified as amended at 20 U.S.C. §§ 1088, 1091(d)).

28.    A school could establish a borrower's eligibility under the ATB exception by certifying that it had administered an approved ATB test to the student and that the student had received a passing score.  20 U.S.C. § 1091(d); 34 C.F.R. § 668.32(e).

29.    In 1992, Congress provided that students whose eligibility was falsely certified by an institution would be eligible to have their federally guaranteed student loans discharged.

Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (codified as amended at 20 U.S.C. § 1087); 34 C.F.R. § 682.402(e)(1).

30.     This provision, which applies to loans disbursed in whole or in part on or after January 1, 1986, requires that "if [a] student's eligibility to borrow . . . was falsely certified by the eligible institution . . . then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan." 20 U.S.C. § 1087(c)(1).

31.     The discharge is available to borrowers in instances in which an institution falsely certified an individual's eligibility for a loan by, among other things: certifying that a student had a high school diploma or GED when he or she did not; certifying that the student was eligible under the ATB exception when he or she was not; and/or obtaining loans without a student's authorization.  34 C.F.R. § 682.402(e)(1); 34 C.F.R. § 685.215(a)(1).

32.     As soon as the Department or a guaranty agency has reliable information indicating that a borrower might be eligible for a discharge, it is required to suspend all efforts to collect from the borrower and to notify the borrower of the procedures for requesting a discharge. 34 C.F.R. § 682.402(e)(6)(ii); 34 C.F.R.§ 685.215(d)(1).

33.     Department regulations set forth the procedures by which a borrower can submit an application for a false certification discharge. 34 C.F.R. § 682.402(e)(3), 34 C.F.R. § 685.215(c).

34.     In evaluating a borrower's request for a discharge, the Department or guaranty agency, if any, must consider the request "in light of information available from the records of the agency and from other sources, including other guaranty agencies, state authorities, and cognizant accrediting associations." 34 C.F.R. § 682.402(e)(6)(iv); 34 C.F.R. § 685.215(d)(3).

35.    The Department "expects a guaranty agency to obtain existing documentation available from any public or private agency that reviewed or had oversight responsibility for the school" in order to find supporting evidence for a false certification discharge application.  DCL Gen-95-42 (Sept. 1995).

36.    Guaranty agencies must also maintain, on a school-by-school basis, all oversight material they obtain in evaluating ATB discharge applications and in investigating allegations of ATB violations, as well as a school-by-school record of the number of discharge applications they have received, the campuses to which each application pertains, the date of attendance of the student applying for a discharge, and whether the discharge was granted or denied.  DCL FP-07-09 (Sept. 24, 2007).

37.    The incidence of discharge applications is evidence of ATB violations at a particular school, as are high withdrawal and default rates.  DCL FP-07-09 (Sept. 24, 2007).

38.    In 2000, the Secretary adopted regulations that allow for discharge of a borrower's loans absent an application from the borrower if he determines that the borrower qualifies for a discharge based on information in his or the guaranty agency's possession. 34 C.F.R. § 682.402(e)(15); *see also* 34 C.F.R. § 685.215(c)(7).

39.    The Secretary provided for discharge without application because "[w]e (or a guaranty agency) occasionally learn of information that strongly suggests that all borrowers in a certain category would likely qualify for a false certification discharge. [ ] In the interest of assisting those borrowers, (many of whom may be unaware of the possibility of receiving a loan discharge), . . . it would be appropriate to discharge those loans without an individual discharge request from each borrower."  65 F.R. 462316 (July 27, 2000).

40.     There is no time limit on a student's eligibility for a false certification discharge. 34 C.F.R. § 682.402(e)(6)(v).

41.     Discharge of a student loan entitles the borrower to: (i) relief from any existing or past obligation to repay the loan and associated costs or charges; (ii) the restoration of the borrower's eligibility to receive federal assistance under the HEA; (iii) reimbursement of amounts paid voluntarily or through enforced collection; and (iv) correction of all adverse credit reports by reporting to all credit reporting agencies to which the holder previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan.  20 U.S.C. §1087(c); 34 C.F.R. § 682.402(e); 34 C.F.R. § 685.215(b).

42.     A loan originated under the FFEL program that is later consolidated under the Direct Consolidated Student Loan program is eligible for false certification discharge if the student's eligibility for the original FFEL loan was falsely certified.   *See* 34 C.F.R. § 685.212.

43.     Although the Secretary generally must seek collection of all federally guaranteed student loans, he is authorized to compromise claims and cease collection efforts at his discretion in certain circumstances. *See* 31 U.S.C. § 3711(a)(3).

44.     The Secretary is authorized to collect student loan debts by many means, including through private collection agencies and administrative wage garnishment.  The Secretary may refer delinquent student loan accounts to the Department of Justice for collection through litigation, and to the Internal Revenue Service for offset through tax refund interception. 34 C.F.R. § 30.1.

45.     The Administrative Procedure Act ("APA") provides that any individual "adversely affected or aggrieved by agency action . . . is entitled to judicial review."  5 U.S.C. § 702.

46.     Specifically, the APA authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "—in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(1) and (2)(A) and (C).

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and a proposed class of:

> All individuals whose eligibility for federally guaranteed student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by the Wilfred American Education Corporation and/or schools owned or operated by the Wilfred American Education Corporation ("Wilfred").

48.     The proposed class is so numerous that joinder of all members is impracticable. Upon information and belief, there are many thousands of individuals who are situated similarly to the Named Plaintiffs.

49.     There are questions of fact common to members of the class including: (i) the extent of information Defendant had and currently has in his possession about Wilfred's widespread fraudulent behavior and its false certification of borrowers' eligibility for federally guaranteed student loans, and (ii) what steps, if any, Defendant has taken to identify borrowers eligible for false certification discharges, inform them of such eligibility and/or discharge borrowers' loans.

50.     There are questions of law common to members of the class including whether Defendant, who was aware of Wilfred's consistent pattern of gross violations of law and regulations in multiple programs over multiple years, acted and continues to act arbitrarily and

capriciously, and in violation of Sections 706(1), (2)(A) and (C) of the Administrative Procedure Act, by (i) failing and refusing to take reasonable steps to determine whether students' eligibility for federally guaranteed loans to attend Wilfred was falsely certified; (ii) actively enforcing Wilfred loan obligations without taking such steps; and (iii) failing to discharge the loans of eligible borrowers.

51.    The claims of the Named Plaintiffs are typical of the claims of all members of the proposed class.  The Named Plaintiffs, like all members of the class, had their eligibility for federally guaranteed student loans falsely certified by Wilfred. The Named Plaintiffs, like all proposed class members, have made payments, been subject to the imposition of involuntary collection activity, interest, and penalties, have had their credit affected, and/or have been unable to attend other schools or obtain other loans because their eligibility for Wilfred loans had been falsely certified and because of Defendant's continued enforcement of Wilfred loan obligations.

52.    The Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any members of the class.

53.    Plaintiffs are represented by the New York Legal Assistance Group, whose attorneys are experienced in class action litigation, including litigation to enforce the rights of consumers, and particularly the rights of individuals with guaranteed student loan debts.

54.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to the practices at issue in this action.  Separate actions would be, as a practical matter, dispositive of the interests of other individual members of the class and would substantially impair their abilities to protect their interests.  Defendants have acted on grounds generally applicable to the class, thereby making a

class action superior to other available methods for the fair and efficient adjudication of this controversy.

55.    Moreover, it would be impracticable for potential plaintiffs, who are primarily low-income individuals with limited access to counsel, to obtain legal services on an individual basis for their claims.  Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

56.    Wilfred, initially opened as a small chain of beauty schools, expanded rapidly after amendments to the HEA made federal student aid dollars available to students of for-profit trade schools.

57.    Between the 1970s and 1988, Wilfred grew from 39 to 58 schools.

58.    In 1988, Wilfred had an enrollment of over 11,000 students nationwide.

59.    Wilfred would not have been able to remain in business and grow without the money it received from the federal student aid program.

60.    Between 1980 and 1989, Wilfred received at least $405 million in loans and grants under the federal student aid program.

61.    In the 1980s, between 80 and 90 percent of Wilfred's revenue was derived from the federal student aid program.

62.    In 1984, Wilfred went public and in 1985, Wilfred's annual revenues reached approximately $75 million.

63.    Wilfred targeted and recruited immigrants and economically disadvantaged individuals for enrollment in its schools.

11

64.     Wilfred was responsible for certifying that each borrower met the requisite eligibility criteria for financial aid.

65.     Wilfred routinely certified students as eligible for federally guaranteed student loans even though the students were not eligible.

66.     Wilfred routinely falsely certified students as eligible for federally guaranteed student loans even though the certified students did not have a valid high school diploma or GED, and Wilfred did not give them ability to benefit ("ATB") tests.

67.     Wilfred either certified that these students did in fact have a valid high school diploma or GED when they did not, or certified that the students had taken and passed an approved ATB test when they had not.

68.     Wilfred administered non-approved ATB tests or ATB tests that were not in a language that the prospective student could read or write.

69.     Wilfred gave inappropriate assistance to prospective students on the tests, including by changing incorrect answers and by filling in answers for the students.

70.     Wilfred routinely falsely certified the eligibility of individuals for loans, and received proceeds from such loans, when the individual did not enroll in or attend any Wilfred school.

71.     Members of the class have suffered harm as a result of these falsely certified loans.

72.     Members of the class spent time in Wilfred programs from which they derived little or no benefit.

73.     Members of the class have paid money toward an invalid debt.

74.     Members of the class have incurred interest, penalties, and collection fees on their student loans that have vastly increased their original debts.

75.     Members of the class have had their federal income tax refunds seized and their wages garnished because of student loans attributable to Wilfred.

76.     Members of the class have had their credit damaged as a result of their Wilfred loans.

77.     Members of the class have consolidated their Wilfred loans under the Direct Consolidated Student Loan Program.

78.     Defendant was and continues to be aware that Wilfred routinely falsely certified eligibility for federally guaranteed student loans.

79.     By the early 1980s, Defendant knew of Wilfred's pattern of violating statutory and regulatory requirements of the student financial aid program as well as the terms of Wilfred's Program Participation Agreement ("PPA") with USED.

80.     In 1982, USED found five Wilfred schools (three in New York and two in Illinois) ineligible for continued participation in the federally guaranteed loan program because borrowers from those locations defaulted on their student loans at an unacceptable rate.

81.     In 1983, USED's Office of the Inspector General ("OIG") began investigating Wilfred schools in Massachusetts for evidence of improper practices regarding their participation in the federally guaranteed student loan program.

82.     In 1985, the OIG began investigating Wilfred schools in Florida.

83.     In 1986, the OIG commenced an in-depth national investigation of Wilfred.

84.     The Department of Education learned that Wilfred had a practice of, among other things, recruiting students who were ineligible for financial aid and then providing false information to USED in order to obtain grants and loans under federal student aid programs.

85.     The Department determined that Wilfred's fraudulent actions were not attributable to low-level rogue employees, but were the result of widespread practices and policies that originated with or were condoned by Wilfred corporate management.

86.     The Department's OIG issued administrative subpoenas to Wilfred and nine of its schools, in furtherance of its investigation into Wilfred's financial aid fraud.

87.     The Department cooperated with the United States Department of Justice in a joint federal task force convened to investigate Wilfred principals and employees.

88.     In October of 1986, the Department of Justice won an indictment from a federal grand jury in Massachusetts against seven former admissions representatives at two Wilfred schools on charges of aiding, abetting, and inducing students to submit false applications for federal grants.

89.     The indictment alleged that Wilfred sales representatives targeted "young, unlearned and disadvantaged" individuals and that sales representatives falsely told students they could attend using "free money" from the government.

90.     The indictment alleged that the fraud and misrepresentation about federal financial aid resulted from the company's quota system, which required admissions representatives to enroll a specific number of students in a given time period or lose their jobs.

91.     Additional charges were later brought against the managers of the Massachusetts schools and Wilfred itself.

92.     In 1988, the Department of Justice won an indictment from a grand jury in the Middle District of Florida against Wilfred, its president, Philip E. Jakeway, and 18 Wilfred employees for violations of various laws in connection with Wilfred's administration of student financial aid.

93.     The indictment charged Wilfred principals and employees with conspiring to defraud the Department, with 28 counts of making false statements before the Education Department, with 27 counts of stealing, embezzling, or misapplying funds provided or insured by the Education Department, with eight counts of wire fraud, and with one count of racketeering under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1691 et seq..

94.     The indictment cited 64 specific instances of financial aid fraud and false certification by Wilfred.

95.     Wilfred employees admitted to falsifying applications for financial aid.

96.     Former employees at Wilfred's Florida locations also admitted to enrolling students who could not read.

97.     In December 1988, the Department attempted to terminate 58 Wilfred schools from the federally guaranteed loan program because of the federal indictment.  Wilfred successfully defeated this attempt on procedural grounds.

98.     The Department subsequently placed Wilfred on "reimbursement status" in the federal student aid program, meaning that Wilfred could no longer draw money for its students in advance, and could only be reimbursed by the Department after submitting proper documentation.

99.    In March 1989, the Department suspended Career Education Assistance Corporation, a wholly owned subsidiary of Wilfred, from participation in Title IV programs, based on its affiliation with Wilfred.

100.    In April 1989, the Department's OIG sent a memorandum to the Office of Postsecondary Education, describing its investigation of Wilfred, including Wilfred's corporate offices in New York. The memorandum stated, among other things, that Wilfred establishes operational and financial aid policies for all of its schools nationwide and that the Department's regional office in New York had conducted a program review of an ABI school located in Newark for years between 1984 and 1987 and found that students who did not have the ability to benefit were admitted, and that school personnel graded ATB exams and improperly graded them.

101.    The New Jersey Commissioner of Education withdrew its authorization of ABI Newark, a Wilfred school, in October 1990.

102.    The April 1989 OIG memorandum also stated that 19 Wilfred employees from schools in Massachusetts, the District of Columbia, and California had been convicted on charges of financial aid fraud.

103.    In 1991, the United States District Court in Massachusetts found that Wilfred submitted false applications for financial aid, fined Wilfred over $500,000, and convicted employees on nine counts of mail fraud.

104.    Also in 1991, Wilfred was convicted in the United States District Court for the Middle District of Florida of defrauding the federal government of millions of dollars of student aid.

105.    The Department was aware that Wilfred continued to certify students as eligible for loans and to operate with federal student aid, despite the criminal convictions and numerous allegations of fraud, and despite having filed for protection under Chapter 11 of the Bankruptcy Code in May 1990.

106.    The last Wilfred school ceased operation in 1994.

107.    Because of rampant abuse in the federal student aid program, such as that perpetrated by Wilfred, in the early 1990s the Senate conducted an investigation of the program and found "one of the most widely abused areas of trade school practices was admissions and recruitment, in particular the admission of students who had not finished high school under the so-called 'ability-to-benefit' or 'ATB' rule." *Abuses in Federal Student Aid Programs*, S. Rep. No. 102-58 (1991) (hereinafter "Nunn Report").

108.    The Senate concluded that USED "has effectively abdicated its [federal student loan program] oversight responsibilities to private accrediting bodies, State licensing authorities, and guaranty agencies.  Experience has proven that those bodies have neither the motivation nor the capabilities to effectively police the program."  Nunn Report at 34.

109.    Congress thereafter created the false certification discharge.

110.    Absent this provision, students whose eligibility for student loans was falsely certified had little if any recourse.  Federal student loans are rarely dischargeable in bankruptcy and are not subject to a statute of limitations on collection.

111.    After an investigation into Wilfred's bad practices, on June 19, 1996, Defendant issued findings and a recommendation based on the Department's OIG reports through June, 1987, titled "Documentation of ATB violations," covering approximately 50 Wilfred schools.

112.    The 1996 report noted that Wilfred's "[c]onsistent pattern of gross violations of DOE regulations in multiple programs over multiple years indicates a strong resistance to following DOE regulations for administering funds and ATB student testing.  Violations appeared system wide."

113.    The 1996 report also noted that"[s]ystemic violations [were] found in multiple reports. A Federal Grand Jury indicted the CEO of Wilfred American Educational Corporation plus 18 past and present employees for fraud and falsifying information on applicants and applications."

114.    The conclusion of the 1996 report was that "[s]ince the corporation was cited as early as June 1984 for improper grading practices, it is recommended that all ATB applications be discharged."

115.    Upon information and belief, in the specific instances in which Wilfred students have submitted discharge applications demonstrating that they meet the basic eligibility requirements for a false certification discharge, Defendant has granted the discharge.

116.    The Department has the authority to authorize "group discharges," in circumstances in which a school has "serious and well-documented ATB violations."  In such instances, the Department informs guaranty agencies that it has made a determination that discharge is appropriate for a cohort of students.  DCL Gen-95-42 (Sept. 1995).

117.    In several instances, upon requests from legal services organizations, state authorities and guaranty agencies, the Department has granted group discharges for students who borrowed money to attend schools with well-documented ATB violations.

118.    In a letter to Defendant dated April 16, 2013, the New York Legal Assistance Group ("NYLAG"), counsel for Plaintiffs, requested that Defendant "contact all student loan

debtors whose loans were taken out in order to attend any Wilfred-operated school, to advise them of their right to apply for discharges if they meet the requirements."

119.    NYLAG also requested that Defendant suspend all collection efforts on such loans, grant every application from students eligible for discharge and direct any other holders to do the same.

120.    After receiving no response to the April 16, 2013 letter, in a letter dated July 16, 2013 and in another letter dated September 24, 2013, NYLAG again requested that Defendant take the following actions: (i) suspend collection efforts on all federally guaranteed student loans attributable to Wilfred, including those held by guaranty agencies; (ii) notify all students who attended any Wilfred school, regardless of whether their loans have already been paid in full or not, that collection has been suspended and about the availability of a discharge for eligible borrowers; and (iii) grant all Wilfred discharge applications for eligible borrowers and direct guaranty agencies to do the same.

121.    In a letter to NYLAG dated February 18, 2014, Defendant denied NYLAG's request in substantial part, and agreed only to mail discharge applications to students who attended one Wilfred school – the Philadelphia campus – between July 1, 1987 and 1989.

122.    Upon information and belief, the majority of class members are, and have always been, unaware of the availability of a false certification discharge.

123.    Upon information and belief, Defendant has or had information in his possession demonstrating that specific loans were falsely certified by Wilfred and therefore eligible for false certification discharges, and he did not grant such discharges.

124.    Despite having knowledge of Wilfred's bad practices, including its pattern of falsely certifying students' loan eligibility, despite having information indicating that current or

former Wilfred borrowers may be eligible for a discharge, and despite the findings in the Department's 1996 report, Defendant has not taken steps to: i) suspend efforts to collect on loans attributed to Wilfred borrowers; ii) identify whether individuals' eligibility for federally guaranteed students loans was falsely certified by Wilfred; or iii) inform Wilfred borrowers of the possibility of discharge or the procedures for requesting a discharge.

125.    Despite having knowledge of Wilfred's bad practices, including its pattern of falsely certifying students' loan eligibility, despite having information indicating that current or former Wilfred borrowers may be eligible for a discharge, and despite the findings in the Department's 1996 report, Defendant has continued to collect on student loans disbursed to Wilfred schools, including through private collection agencies, administrative wage garnishment, referral to the Department of Justice for collection through litigation, and referral to the Internal Revenue Service for offset through tax refund interception.

126.    Despite having knowledge of Wilfred's bad practices, including its pattern of falsely certifying students' loan eligibility, despite having information indicating that current or former Wilfred borrowers may be eligible for a discharge and despite the findings in the Department's 1996 report, Defendant has failed to send notice, as required by regulation, and to discharge the loans of Wilfred borrowers whose loans were falsely certified, as required by statute.

## FACTS ABOUT NAMED PLAINTIFFS

*Ana Salazar*

127.    Ana Salazar is 65 years old. She was born in the Dominican Republic, where she attended school through the eighth grade.

128.    In the early 1980s, after she had settled in the United States, Ms. Salazar worked in various jobs to earn enough money to care for her children; she worked at a factory packing books, at a garment factory putting size tags on clothes, and for two to three years as a security guard for Wells Fargo bank.

129.    She was unsatisfied with these jobs because they did not pay well and were seasonal or temporary.

130.    In 1988, Ms. Salazar saw advertisements for Wilfred Academy on a Spanish television channel.  The advertisements caught her eye because they portrayed Wilfred Academy as the "best" beauty school and promised that one could obtain a diploma in a short amount of time.

131.    Ms. Salazar was attracted by the promise in the advertisement that graduates of Wilfred Academy would get jobs after completion of the short program.

132.    Ms. Salazar therefore went to a Wilfred Academy located on 50th Street and Broadway in Manhattan to inquire about the program.

133.    That day she met with a representative of Wilfred Academy, was given a tour of the school, and was told about the benefits of the beauty program.

134.    Ms. Salazar did not speak English at the time she met with the representative of Wilfred Academy.  The representative spoke to her in Spanish and explained why Wilfred Academy was not just a good choice, but the best choice for a training program.

135.    He promised her "the land and the skies," and said that when she finished with her program, Wilfred Academy would help her find a job, and then one day she would be able to open her own salon.

21

136.    A representative of Wilfred Academy asked Ms. Salazar for her basic information (name, social security number and address) and then filled out some forms and asked her to sign. The forms were all in English so she did not understand them and could not read them on her own.

137.    Ms. Salazar did not then and still does not have a high school diploma or GED.

138.    She was never asked by a Wilfred representative whether she had a high school diploma or GED.

139.    Ms. Salazar was not given any test before she was certified as eligible for a guaranteed student loan.

140.    Ms. Salazar was disappointed with the quality of the Wilfred program and felt that she did not learn anything but was determined to finish the program.

141.    About six months into the program, Ms. Salazar was not well and needed to take a short break because of her medical problems.

142.    She called Wilfred Academy and told them that she needed two weeks off to deal with her medical issues.  The school told her that was no problem and that she should come back to school when she was ready.  The school also told her that they would help her to catch up on what she missed when she was feeling better and back in school.

143.    Relying on these assurances, Ms. Salazar took two weeks off with the intention of returning to finish the program when she was better.

144.    Approximately two weeks later, Ms. Salazar returned to Wilfred Academy to finish the program.  The school was closed.

145.    Ms. Salazar called the school and returned to the school multiple times but the school remained closed and she could not finish the program.

146.    Two loans were disbursed to Wilfred Academy for Ms. Salazar, both on November 2, 1988, one in the amount of $4,000, and the other in the amount of $2,625.

147.    In the early 1990s, Ms. Salazar wanted to get an office job.  She applied to a school in downtown Manhattan offering training for office assistants.  The school determined that she was in default on her Wilfred Academy loans and therefore she would not be able to take out another loan.

148.    In 1993, Ms. Salazar enrolled in a free training program to learn to be a health care and child care worker.  She eventually found a job as a child care provider and worked for 13 years before retiring.

149.    Throughout the 13 years that Ms. Salazar worked as a child care provider, she paid between $80 and $100 per month (depending on her income) toward her Wilfred debt, pursuant to a payment plan she arranged with collectors of the debt.

150.    Ms. Salazar struggled enormously to cover the expenses of rent, utilities and food for herself and her four children, in addition to these monthly payments for her Wilfred debt.

151.    At the direction of Defendant, the IRS has seized her federal income tax refunds approximately five times, in service of her debt from Wilfred.

152.    Despite having paid, voluntarily and involuntarily, over $7,000 towards her student loan debt, she still owes an outstanding principal balance of $10,131 and $6,241 in outstanding interest.

153.    Ms. Salazar cannot afford to make payments towards this debt.  She now lives on Social Security retirement and SSI benefits, and supplements this with food stamps.

154.    The only communications that Ms. Salazar has received from the Defendant were attempts to collect her loans; she never received any communication from the Department informing her of the availability of a false certification discharge.

*155.*    Ms. Salazar only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

**Marilyn Mercado**

156.    Marilyn Mercado was born in Brooklyn, New York.

157.    Ms. Mercado dropped out of school during junior high school.

158.    A few years later, a friend of hers told her about Wilfred Academy.  In 1987, Ms. Mercado went to a Wilfred Academy located at Broadway and 50th Street in Manhattan to sign up for classes.

159.    Ms. Mercado met with a representative of Wilfred Academy who enrolled her in the beauty program.

160.    The representative promised Ms. Mercado that Wilfred Academy would help her to find a job in a salon after finishing the program.

161.    Ms. Mercado was only 17 years old when she signed up for Wilfred Academy and she does not remember very much about the application process.

162.    She understood that she was taking out a loan but also believed that either her friend, who had suggested she go to Wilfred Academy and hoped to open her own salon, or Wilfred Academy would help her get a job so that she would easily be able to pay back the loan.

163.    Ms. Mercado had no high school diploma or GED when she enrolled in Wilfred Academy, and she was not asked by Wilfred Academy whether she had a high school diploma or GED.

164.    She was not given any test before Wilfred Academy certified her eligibility for student loans.

165.    Ms. Mercado completed the program at Wilfred Academy and received a certificate from the school.

166.    Ms. Mercado did not learn anything useful at Wilfred Academy, not even how to cut hair.

167.    Ms. Mercado sought assistance from Wilfred Academy in finding a job, because her friend did not open her salon as planned.

168.    Wilfred Academy did not assist Ms. Mercado in finding a job.

169.    Ms. Mercado found a job on her own working in a salon but she only worked there for a few days.  She was hired to cut hair, but the owner of the salon limited her to washing hair because she did not actually know how to cut hair.

170.    Ms. Mercado took some practice cosmetology license tests while at Wilfred Academy but failed all of them.

171.    Some of Ms. Mercado's friends who went to Wilfred Academy took the licensing test and they told her that the test was very hard; almost all of them failed.

172.    Ms. Mercado never attempted the test to get her license.

173.    After leaving Wilfred Academy, Ms. Mercado decided to pursue a job working with computers.

174.    A friend told her about American Business Institute ("ABI"), on Grand Concourse in the Bronx, near where she lived at the time.

175.    Ms. Mercado enrolled in ABI.  At the time, she had no high school diploma or GED, nor was she asked if she had a high school diploma or GED or given any test before being certified as eligible for federally guaranteed student loans.

176.    Ms. Mercado never finished the program at ABI; she found the course material very difficult and the instruction poor; she often failed the tests that were given.

177.    Three loans were disbursed to Wilfred schools for Ms. Mercado: in April of 1987, a loan for $3,150 was disbursed to Wilfred Academy, and in May of 1989, two loans were disbursed to ABI in the amounts of $2,625 and $2,800.

178.    In the years after she went to ABI, Ms. Mercado had several low-paying jobs and experienced periods of un- or under-employment.

179.    Over the years, she has made payments on her student loans when she was able.

180.    Ms. Mercado ultimately defaulted on her student loans because she was unable to pay.

181.    She currently works for the New York City Board of Education as a school bus attendant and is training to be a school bus driver.

182.    At the direction of Defendant, the IRS seized Ms. Mercado's 2012 federal income tax refund, which was just under $8,000, in service of her student loan debt.

183.    Despite the many voluntary and involuntary payments she has made toward her student loans, Ms. Mercado still owes a total of $8,231 in outstanding principal and $6,679 in outstanding interest for all three loans combined.

184.    Her student loan debt and default have impaired her credit to the point where she is unable to obtain an extension of credit.

185.    Ms. Mercado learned only recently from Plaintiffs' attorneys of the existence of the false certification discharge and that she is eligible for such a discharge.

*186.*    The only communications she has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

### Ana Bernardez

187.    Ana Bernardez is 57 years old. She was born in Honduras and moved to the Bronx when she was 11 years old.

188.    Ms. Bernardez dropped out of high school when she was 17.

189.    After working intermittently in factory jobs, Ms. Bernardez saw multiple advertisements on television for Wilfred Academy, which showed happy women working in salons and promised future graduates a certificate and a job immediately after graduation.

190.    Thereafter, Ms. Bernardez met with a representative of a Wilfred Academy located on Fordham Road.

191.    The representative told Ms. Bernardez that if she enrolled in Wilfred Academy, she would learn how to cut and style hair and that she could even make money while enrolled in school.

192.    He told her that Wilfred Academy would help to find her a job while she was still in school, and that after graduation she could own her own beauty salon business.

193.    He told her that she could enroll at once, and start classes the following Monday.

194.    He told her that the only requirement for enrollment was a social security number, which Ms. Bernardez provided to him, and she enrolled.

195.    At the time she enrolled in Wilfred Academy, Ms. Bernardez did not have a high school diploma or GED, nor was she asked whether she had a high school diploma or GED.

196.    Ms. Bernardez was not given any test before she was certified as eligible for a guaranteed student loan.

197.    The Wilfred Academy representative told Ms. Bernardez that the program would cost only a few hundred dollars.  She was not told that she had been certified as eligible for federally guaranteed loans and that she would have to pay back thousands of dollars for the program.

198.    Ms. Bernardez took classes at night, after working during the day.  She attended Wilfred Academy for less than two weeks and dropped out because she felt that the program was so bad that it would not lead to employment.

199.    Two federal student loans were disbursed on August 9, 1988 to Wilfred Academy for Ms. Bernardez, the first in the amount of $2,625 and the second in the amount of $4,000.

200.    Because Ms. Bernardez did not understand that she had taken out loans to attend Wilfred, she assumed that she did not owe any money for the less than two weeks she had attended Wilfred Academy.

201.    Years later, Ms. Bernardez went to buy furniture and tried to get a loan to cover some of the cost.  She was told that she could not get the loan because she had a bad credit score but she did not understand why.

202.    In the late 1990s, she learned of her student loan debt when she consulted a lawyer about her debt problems.

203.    Ms. Bernardez believes that signing up for Wilfred Academy in 1988 was the biggest mistake she made in her life.

204.   Bad credit has haunted Ms. Bernardez and her family for years as a result of the Wilfred debt.

205.   In 2013, Ms. Bernardez's daughter, Nancy Martinez, asked her mother to co-sign a loan for her, but Ms. Bernardez could not because of her bad credit.

206.   Ms. Bernardez has had her federal income tax refunds seized by the IRS approximately five times at the direction of Defendant, because of her student loans.  The intercepted refunds ranged from $500 to as much as $4,000.

207.   Despite the payments she has made toward her student loans over the years, she still owes $20,462 on the loan principal and $2,323 in interest.  Ms. Bernardez's loans are currently in forbearance because she cannot afford to make payments.

208.   Ms. Bernardez worked as a home attendant for many years until 2004 when she stopped because of health problems.  She has had multiple operations because of brain tumors discovered in 2009 and ultimately found to be cancerous.  She is also diabetic and has heart problems and a bad knee.

209.   She now collects Social Security Disability benefits and Food Stamps.

210.   The only communications that Ms. Bernardez has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

*211.*   Ms. Bernardez only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

### Jeannette Poole

212.   Jeanette Poole is 50 years old.

213.   She was born in Bedford-Stuyvesant, Brooklyn.

29

214.    She dropped out of school when she was 18 years old and never finished high school or obtained a GED.  She was homeless at the time and found it difficult to attend school.

215.    In 1987, a friend suggested to Ms. Poole that she consider attending Wilfred Academy so that she could get a job in a hair salon.

216.    Subsequently, Ms. Poole passed by a Wilfred Academy on Fulton Street and decided to go in to find out about the school.  She met with a representative of Wilfred Academy.

217.    The representative promised that Wilfred Academy would help Ms. Poole find a job after completing the program. The representative asked for Ms. Poole's name, social security number and date of birth so that she could see if Ms. Poole qualified for loans to cover the cost of the program.

218.    The representative told Ms. Poole that she qualified for a student loan.

219.    At that time, Ms. Poole decided not to enroll or seek a student loan.  She was homeless, sleeping in an abandoned building, and did not think she was in a position to take on a loan.

220.    Ms. Poole explained to the Wilfred representative that she had just wanted information and that she did not want to sign up for the program.

221.    Ms. Poole left Wilfred that day and never went back.

222.    Nonetheless, entirely without Ms. Poole's knowledge, on July 9, 1987, two loans were disbursed to Wilfred Academy for Ms. Poole in the amounts of $2,625 and $2,925.

223.    Ms. Poole had no idea, until she was contacted by a bank attempting to collect, that a student loan had been taken out in her name.

224.    Ms. Poole did not believe that she had any obligation to pay for this unauthorized loan.  The loan went into default.

225.    In approximately 1999, Ms. Poole applied to a business training program at Lenore Community College in Kinston, North Carolina to learn to start a business. She learned that, because she was in default on loans to Wilfred, she was not eligible for any federally guaranteed student loans. She enrolled in a few free programs, but was unable to take the full business course because it was too expensive and she could not obtain financial aid.

226.    Ms. Poole attempted multiple times to obtain an extension of credit for a variety of reasons, including for necessary repairs to living quarters that were damaged by a flood. Each time, she was denied an extension of credit because of her defaulted Wilfred loan.

227.    On at least one occasion, at the direction of Defendant, the IRS has seized Ms. Poole's federal income tax refund, in service of her Wilfred loan.

228.    Ms. Poole has made efforts for years to contest the Wilfred loan. She attempted on multiple occasions to dispute the obligation to the IRS and USED, but to no avail.

229.    The only communications that Ms. Poole has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

230.    Despite never having attended Wilfred Academy, Ms. Poole still owes money on defaulted Wilfred loans. The outstanding principal on the loans is $5,820 and the interest is $2,781.

231.    Ms. Poole only learned about the possibility of obtaining a false certification discharge of her Wilfred loans when she was put in touch with Plaintiffs' attorneys.

*Edna Villatoro*

232.    Edna Villatoro is 49 years old. She was born in Guatemala and moved to Newark, New Jersey, when she was approximately 14 years old.

233.    Ms. Villatoro dropped out of high school at the age of 16, without obtaining a high school diploma.

234.    When she was approximately 22 years old, Ms. Villatoro decided to go back to school. A friend of hers told her about the Wilfred Beauty Academy, and they went together to Wilfred to apply for the cosmetology program.

235.    Ms. Villatoro and her friend met with a representative of the Wilfred Academy located at 1140 Raymond Boulevard in Newark, New Jersey.

236.    The Wilfred representative told Ms. Villatoro that Wilfred Academy would help to find her a job after she finished the program.

237.    At the time she enrolled in Wilfred Academy, Ms. Villatoro did not have a high school diploma or GED.

238.    Ms. Villatoro was told that the school offered GED classes and that Wilfred would help her to obtain a GED while she was enrolled in the cosmetology program.

239.    She was told that she could take the GED classes at Wilfred; however, Wilfred never provided a teacher for GED classes while Ms. Villatoro was enrolled.

240.    Ms. Villatoro was not given any test before she was certified as eligible for a federally guaranteed student loan.

241.    The Wilfred Academy representative told Ms. Villatoro that the cost of the program would be covered entirely by government grants and that she would not have to pay to attend the Wilfred program.

242.    Ms. Villatoro was not told that she had been certified as eligible for federally guaranteed loans and that she would have to pay back thousands of dollars for the program.

243.    After Ms. Villatoro finished the program at Wilfred, Ms. Villatoro inquired about getting a license to work as a cosmetologist in New Jersey.

244.    Ms. Villatoro learned then, only after completing the program, that in order to apply for a license in New Jersey, an applicant must demonstrate successful completion of a high school diploma or its equivalent.

245.    She was angry because Wilfred had promised to help her get a GED but did not come through on that promise.

246.    Wilfred had never informed Ms. Villatoro that she had to have a high school diploma or GED to obtain a license in New Jersey, where she lived.

247.    As a result, Ms. Villatoro never got her license and was never employed by a salon.

248.    Two federal student loans were disbursed in September 1987 to Wilfred Academy for Ms. Villatoro, the first in the amount of $4,000 and the second in the amount of $2,625.  A third loan was disbursed on October 3, 1988 in the amount of $2,625.

249.    Approximately one year after she finished at Wilfred, Ms. Villatoro started receiving letters indicating that she owed money because she attended Wilfred.   For years after that, she received frequent phone calls from collectors seeking payments on her Wilfred debt. She still receives the calls; however, they are now less frequent.

250.    Ms. Villatoro made payments in the amount of $250 per month on her Wilfred debt for years.

251.    She eventually stopped making payments because she was unemployed and couldn't afford the payments; the loans went into default in 1993 and remain in default.

252.    Bad credit has haunted Ms. Villatoro and her family for years as a result of the Wilfred debt.

253.    Ms. Villatoro has had her federal income tax refunds seized by the IRS approximately two times at the direction of Defendant, because of her Wilfred student loans.

254.    Despite the payments she has made toward her Wilfred student loans over the years, she still owes $9,758 on the loan principal and $15,186 in interest.

255.    The only communications that Ms. Villatoro has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

256.    Ms. Villatoro only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

*Lisa Bryant*

257.    Lisa Bryant is 46 years old. She was born in Freeport, Louisiana and currently lives in Houston, Texas.

258.    Ms. Bryant dropped out of high school during her senior year without receiving a high school diploma.

259.    In 1987, Ms. Bryant was walking around downtown Houston and walked into a building to cool off.  Inside the lobby of the building, which was at 700 Fannin Street, was an advertisement for Wilfred Academy.  The advertisement made Wilfred seem appealing, and as she had always been interested in beauty and makeup, she went inside to learn more about the school.

260.    That very same day, Ms. Bryant was enrolled in Wilfred's cosmetology program.

261.    Ms. Bryant met with a Wilfred financial aid representative.  She was told by the Wilfred representative that she would be taking out a loan in the amount of $2,500 to cover the cost of the Wilfred program.

262.    The Wilfred representative told Ms. Bryant that she qualified for federal aid and then Ms. Bryant filled out some paperwork.

263.    Ms. Bryant was also told that Wilfred would help her find a job, and if she did not find a job within six months after graduation from the program, she would get her $2,500 refunded and would not have to pay back the loan.

264.    Ms. Bryant did not then and still does not have a high school diploma or GED.

265.    She was never asked by a Wilfred representative whether she had a high school diploma or GED.

266.    Ms. Bryant was not given any test before she was certified as eligible for a guaranteed student loan.

267.    After Ms. Bryant attended classes for approximately three months, the Wilfred Academy at Fannin Street closed.  Ms. Bryant went to school one day and a security guard stopped her and told her that the school was closed for the day but to come back the next day.

268.    Ms. Bryant went back a number of times after that, but each time she arrived at the school, she was told that the school was still closed and that she could not enter the building.

269.    Ms. Bryant never received any correspondence regarding the closure of the Fannin Street Wilfred Academy nor was she ever informed about any transfer opportunities.

270.    Because the school closed and she was unable to finish the Wilfred program, Ms. Bryant did not realize that she had to pay back her Wilfred loans until the early 1990s when she started to receive letters and phone calls about the loans.

271.    Ms. Bryant struggled enormously to cover the expenses of rent, utilities, and food for herself and her seven children.  She has had great difficulty paying the Wilfred debt each month and she has never been able to obtain a credit card or take out a loan to buy a car or a home because of her Wilfred debt.

272.    Ms. Bryant currently supports herself and her family by doing housekeeping at Texas Children's Hospital.

273.    In 1993, Ms. Bryant's loans went into default.

274.    At the direction of Defendant, the IRS has seized her federal income tax refunds at least four times in service of her debt from Wilfred.  In 2012, her tax refund of $5,610 was seized.

275.    Despite having made payments, voluntarily and involuntarily, toward her Wilfred debt, Ms. Bryant still owes an outstanding principal balance on her Wilfred debt of $7,504 and $1,119 in outstanding interest.

276.    The only communications that Ms. Bryant has received from the Defendant were attempts to collect her loans; she never received any communication from the Department informing her of the availability of a false certification discharge.

277.    In 2014, Ms. Bryant searched for information about Wilfred on the internet and eventually learned about Plaintiffs' lawsuit against Defendant Duncan.

278.    Ms. Bryant contacted Plaintiffs' attorneys, and it was only after speaking with them that she became aware of the possibility of obtaining a false certification discharge of her Wilfred student loans.

***Cherryline Stevens***

279.     Cherryline Stevens is 49 years old. She was born in Jamaica and moved to New York City with her two daughters in 1987.

280.     Ms. Stevens never obtained a valid high school diploma or GED.  She finished the 11th grade in Jamaica and obtained only a "certificate," which is not the equivalent of a high school diploma in the United States.

281.     Ms. Stevens lived one block from a Wilfred Academy in Jamaica, New York when she arrived in this country.

282.     Ms. Stevens saw the signs for Wilfred near her home.  At the time, she thought that Wilfred presented an exciting, brand new opportunity and that attending Wilfred would lead to employment so that she could support her family.

283.     Many people she knew at the time attended Wilfred so going to Wilfred seemed like "the thing to do" among her peers.

284.     Ms. Stevens walked into the Wilfred Academy in Jamaica one day to sign up for the program.  A Wilfred representative told her how "wonderful" the school was and encouraged her to sign up right away.

285.     The Wilfred representative told Ms. Stevens that she would have to get a license before getting a job, but she made it sound easy.

286.     Ms. Stevens enrolled in the program and signed up for financial aid.  She knew that Wilfred applied for loans for her to attend Wilfred, but she did not know the full amount of the loans.

287.     Ms. Stevens was never asked by a Wilfred representative whether she had a high school diploma or GED.

288.    She was not given any test before she was certified as eligible for a federally guaranteed student loan.

289.    Ms. Stevens finished the Wilfred program, although she does not believe that she learned very much, and attended a graduation ceremony.

290.    After graduation, Ms. Stevens asked the school for her official diploma so that she could apply to take the test to get a license.  She asked the school on multiple occasions for her diploma, but she was never able to obtain it.  Each time she went to the school to pick it up, she was given different excuses for why it was not ready.

291.    Because she never received her diploma, Ms. Stevens was never able to take the test to get her license to be a cosmetologist.  As a result, she felt that the Wilfred program was a huge waste of time.

292.    One loan was disbursed to Wilfred Academy in 1988 for Ms. Stevens in the amount of $2,625.

293.    Soon after she finished at Wilfred, Ms. Stevens started to receive letters in the mail about her Wilfred debt.  She was very worried because she could not afford to pay the debt.

294.    In 1990, Ms. Stevens defaulted on her Wilfred loan.

295.    Approximately eight years ago, Ms. Stevens started working at Queens Village Day Care.  While employed there, her wages were garnished because of her student debt.

296.    Ms. Stevens now works for a child care provider called Center for Excellence, and her wages are no longer being garnished.

297.    Ms. Stevens has had her federal tax refund intercepted at least three times, in service of her student loan debt.

38

298.    In 2006, Ms. Stevens consolidated her loans to get out of default; however, she has been unable to make payments and went into default again in 2007.

299.    Ms. Stevens currently pays fifty dollars per month toward her student debt.

300.    Ms. Stevens has been unable to take out loans or apply for credit as a result of her student loans.  At one point, she applied for a credit card and was denied.

301.    A few years ago, Ms. Stevens' daughter asked her to co-sign a loan so that she could buy a car, but the loan request was rejected because of Ms. Stevens' bad credit.

302.    The only communications that Ms. Stevens has received from the Defendant were attempts to collect her loans; she never received any communication informing her of the availability of a false certification discharge.

303.    Ms. Stevens only learned about the possibility of obtaining a discharge of her student loans when she was put in touch with Plaintiffs' attorneys.

### FIRST CLAIM FOR RELIEF

Defendant's pattern and practice of enforcing Wilfred loan obligations without taking reasonable steps to determine whether the loans are eligible for false certification discharge and/or his failure and refusal to take reasonable steps to determine which Wilfred loans are eligible for false certification discharge, despite his knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans, were and continue to be arbitrary, capricious, an abuse of discretion, short of statutory right, or otherwise not in accordance with the Higher Education Act, 20 U.S.C. § 1071, *et seq.* and its implementing regulations, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (2)(C).

## SECOND CLAIM FOR RELIEF

Defendant's failure to comply with his statutory obligation under 20 U.S.C. §§ 1070(b) and 1087(c)(1) to discharge loans that have been falsely certified by Wilfred; and/or unlawful failure to suspend collection and/or send notice of the availability of false certification discharges to those who borrowed to attend a Wilfred school, in light of his knowledge that Wilfred borrowers might be eligible for discharge, as required by 34 C.F.R. §§ 682.402(e)(6)(ii) and 685.215(a)(1), are unlawful under the Higher Education Act, 20 U.S.C. § 1071, *et seq*. and its implementing regulations, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1) .

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

1.     Certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, with the class consisting of:

> All individuals whose eligibility for federally guaranteed student loans, disbursed in whole or in part on or after January 1, 1986, was falsely certified by the Wilfred American Education Corporation and/or schools owned or operated by the Wilfred American Education Corporation ("Wilfred").

2.     Declaring that:

> a.     Defendant's pattern and practice of enforcing Wilfred loan obligations without taking reasonable steps to determine whether the loans are eligible for false certification discharge and/or his failure and refusal to take reasonable steps to determine which Wilfred loans are eligible for false certification discharge, despite his knowledge that Wilfred routinely falsely certified individuals' eligibility for federally guaranteed student loans, were and continue to be arbitrary, capricious, an abuse of discretion, short of statutory

right, or otherwise not in accordance with the Higher Education Act, 20 U.S.C.

§ 1071, *et seq.* and its implementing regulations, in violation of the

Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (2)(C), and

      b.      Defendant's failure to comply with his statutory obligation under

20 U.S.C. §§ 1070(b) and 1087(c)(1) to discharge loans that have been falsely

certified by Wilfred; and/or unlawful failure to suspend collection and/or send

notice of the availability of false certification discharges to those who borrowed

to attend a Wilfred school, in light of his knowledge that Wilfred borrowers

might be eligible for discharge, as required by 34 C.F.R. §§ 682.402(e)(6)(ii)

and 685.215(a)(1), are unlawful under the Higher Education Act, 20 U.S.C. §

1071, *et seq*. and its implementing regulations, in violation of the Administrative

Procedure Act, 5 U.S.C. § 706(1).

3.   Enjoining Defendant to:

      a.      Immediately suspend collection on all federally guaranteed

student loans disbursed to Wilfred in whole or in part on or after January 1,

1986;

      b.      Take reasonable steps to identify all individuals who had their

eligibility for federally guaranteed student loans falsely certified by Wilfred;

discharge the Wilfred loans of those individuals and provide all relief as

required by 20 U.S.C. § 1087(c); and inform those individuals of the possibility

of such discharge;

      c.      Immediately discharge the loans of all individuals about whom

he has information that the individual is eligible for a false certification

discharge; take all steps required by 20 U.S.C. § 1087(c) to provide full relief to those individuals; and inform them of the discharge.

4.      Ordering Defendant to pay the cost of this action, together with reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(l)(A), as determined by the Court; and

5.      Granting such other and further relief as the Court may deem just and proper.

Dated:       May 28, 2014
             New York, New York                    By:

                                                   Respectfully submitted,

                                                   YISROEL SCHULMAN, ESQ
                                                   New York Legal Assistance Group
                                                   Jane Greengold Stevens, of counsel
                                                   Jennifer Magida, of counsel
                                                   Eileen Connor, of counsel
                                                   7 Hanover Square, 7th Fl.
                                                   New York, NY 10004
                                                   Phone: 212-613-5000
                                                   Fax:    212-714-7461