UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ANA SALAZAR, MARILYN MERCADO, ANA
BERNARDEZ, JEANNETTE POOLE, EDNA
VILLATORO, LISA BRYANT and CHERRYLINE
STEVENS, on behalf of themselves and
all others similarly situated,

                Plaintiffs,

   - against -

ARNE DUNCAN, in his official capacity
as Secretary of the United States
Department of Education,

                Defendant.

-----------------------------------X

14 Civ. 1230 (RWS)

OPINION

A P P E A R A N C E S:

        Attorneys for the Plaintiffs

        NEW YORK LEGAL ASSISTANCE GROUP
        7 Hanover Square
        New York, NY 10004
        By:  Yisroel Schulman, Esq.
            Jane Greengold Stevens, Esq.
            Michelle Movahed, Esq.
            Eileen Connor, Esq.

        Attorneys for the Defendant

        PREET BHARARA
        United States Attorney for the
        Southern District of New York
        86 Chambers Street
        Third Floor
        New York, NY 10007
        By:  Christine S. Poscablo, Esq.
            Ellen London, Esq.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-16-15

**Sweet, D.J.**

Plaintiffs Ana Salazar, Marilyn Mercado, Ana Bernardez, Jeannette Poole, Edna Villatoro, Lisa Bryant, and Cherryline Stevens (the "Plaintiffs") have moved for class certification pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.  Defendant Arne Duncan (the "Defendant"), Secretary of the United States Department of Education ("DOE"), has moved to dismiss Plaintiffs' amended class action complaint ("AC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Upon the conclusions set forth below, Defendant's motion to dismiss the complaint is granted, and Plaintiffs' motion for class certification is denied.

**Prior Proceedings**

On February 25, 2014, Plaintiffs filed their initial complaint.  On May 28, 2014, Plaintiffs filed their motion for class certification as well as the AC, alleging that: (1) Defendant engaged in a pattern and practice of enforcing Wilfred American Education Corporation and/or schools owned or operated

1

by the Wilfred American Education Corporation ("Wilfred") loan

obligations without taking reasonable steps to determine whether

the loans are eligible for false certification discharge and/or

Defendant's failure and refusal to take reasonable steps to

determine which Wilfred loans are eligible for false

certification discharge in violation of the Higher Education Act

("HEA"), 20 U.S.C. § 1071, et seq. and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A) and (2)(C); and (2)

Defendant failed to comply with his statutory obligation under

20 U.S.C. §§ 1070(b) and 1087(c)(1) to discharge loans that have

been falsely certified by Wilfred, and/or unlawful failure to

suspend collection and/or send notice of the availability of

false certification discharges to those who borrowed to attend a

Wilfred school, in violation of the HEA, 20 U.S.C. § 1071, et

seq. and the APA, 5 U.S.C. § 706(1).   (See generally AC.)

        On June 27, 2014, Defendant filed a motion to dismiss

the AC.  The motions were heard and marked fully submitted on

September 24, 2014.

2

**The AC**

The allegations of the AC are assumed to be true and are summarized herein only to the extent necessary to dispose of the instant motions.

Plaintiffs bring this action on behalf of a proposed class consisting of individuals whose eligibility for federal student loans was falsely certified by Wilfred beginning in 1986.  (AC ¶ 47.)  Wilfred initially opened as a chain of beauty schools, which expanded rapidly due to an influx of federal student aid.  (AC ¶¶ 56-60.)  By 1985, Wilfred's annual revenues were approximately $75 million.  (AC ¶ 62.)  Wilfred regularly certified students as eligible for federal financial aid when the students did not have a high school diploma or GED and had not properly passed an "ability to benefit" ("ATB") test.  (AC ¶¶ 65-69.)

Wilfred targeted vulnerable individuals with little education for enrollment, many of whom were recent immigrants, and who were seeking to learn a skilled trade.  (AC ¶ 89.)  At its peak, Wilfred had an annual student enrollment of over 11,000 people.  (AC ¶ 58.)

3

Plaintiffs relied on federal student aid programs in order to pay for tuition. (AC ¶¶ 60-61.) Wilfred routinely falsely certified individuals for federal student loans who were not eligible, either because they did not have a high school diploma or its equivalent and had not passed a properly administered ATB test, or did not actually attend a Wilfred school. (AC ¶¶ 64-70.)

Defendant learned of Wilfred's fraud as early as 1983, when the Department's Office of the Inspector General ("OIG") investigated Wilfred schools in Massachusetts concerning their financial aid practices. (AC ¶ 81.) In 1985, OIG began investigating Wilfred schools in Florida and, with the Department of Justice ("DOJ"), commenced an in-depth, national investigation of all Wilfred schools and its corporate headquarters the following year. (AC ¶¶ 81-83, 87, 100.)

The DOJ brought criminal prosecutions against Wilfred, its president, officers, and individual employees in Massachusetts and Florida, for financial aid fraud and other crimes. (AC ¶¶ 88-96.) These prosecutions resulted in the conviction of Wilfred's president and employees of Wilfred

4

schools located in Massachusetts, the District of Columbia, California, and Florida. (AC ¶¶ 102-05.) In addition, an April 1989 OIG memorandum outlines the investigation of Wilfred and findings of ATB fraud in a New Jersey Wilfred school, and states that Wilfred established operational and financial aid policies for all of its schools nationwide. (AC ¶ 100.)

Prompted by the cumulative reports of OIG, in 1996, Defendant issued findings and recommendations titled "Documentation of ATB violations" covering approximately 50 Wilfred schools. (AC ¶ 111.) The report noted that Wilfred exhibited "a strong resistance for following DOE regulations for administering funds and ATB student testing," and engaged in a "[c]onsistent pattern of gross violations of DOE regulations in multiple programs over multiple years," that "appeared system-wide." (AC ¶¶ 111-12.) The report concludes that "[s]ince the corporation was cited as early as June 1984 for improper [ATB] grading practices, it is recommended that all ATB applications be discharged." (AC ¶ 114.)

There have been "several instances" of group discharges "for students who borrowed money to attend schools

with well-documented ATB violations," upon requests submitted by
legal services organizations.  (AC ¶ 117.)

In connection with the class certification motion,
Defendant estimates that over 61,000 student loans were given to
individuals to attend Wilfred.  (Keller Decl. ¶ 23.)  Most
members who would be included in Plaintiffs' class (those who
attended a Wilfred school and whose eligibility was falsely
certified) are unaware that they can apply to Defendant for a
discharge and that Defendant will grant it.  (AC ¶ 122; see also
Stevens Decl. ¶ 6.)

On April 16, 2013, counsel for Plaintiffs, the New
York Legal Assistance Group ("NYLAG"), wrote to Defendant asking
him to suspend collection efforts on all Wilfred loans, notify
all students who attended any Wilfred school about the
availability of discharge, and grant all discharge applications
of eligible borrowers.  (AC ¶¶ 118-20; see also Keller Decl. ¶
22.)  NYLAG submitted subsequent letters to DOE on July 16, 2013
and September 24, 2013 seeking the same relief.  (AC ¶ 120.)
The DOE denied NYLAG's request "in substantial part" by letter
dated February 18, 2014, agreeing "only to mail discharge

applications to students who attended one Wilfred school" for a two-year period.  (AC ¶ 121.)

The AC asserts that Defendant "has or had information in his possession demonstrating that specific loans were falsely certified by Wilfred and therefore eligible for false certification discharges, and he did not grant such discharges." (AC ¶ 123.) Despite knowing about "Wilfred's bad practices," and the findings in what Plaintiffs describe as a 1996 OIG report, Defendant has failed to take steps to identify and notify students who might be eligible for a discharge due to having attended a Wilfred school and instead has continued to collect on Wilfred student loans.  (AC ¶¶ 124-26.)

**Statutory & Regulatory Framework**

**1. The FFEL Program**

The HEA provides the statutory framework for the Federal Family Education Loan program ("FFEL Program"), pursuant to which "eligible students may receive financial assistance for

higher education."[1]  Chauffeur's Training Sch., Inc. v.
Spellings, 478 F.3d 117, 120 (2d Cir. 2007) (citing 20 U.S.C. §§
1071-87).  The "purpose of these programs is to make available
and subsidize student loans from private lenders with repayment
insured by the government."  Id. (citing 20 U.S.C. § 1071(a)).
Under the FFEL Program, students borrow money from
"participating lenders, such as banks."  Calise Beauty Sch. Inc.
v. Riley, 941 F. Supp. 425, 427 (S.D.N.Y. 1996).  The students'
loans "are insured by participating 'guaranty agencies,' which,
in turn, are reinsured by the Department of Education."[2]  Id.


        There are requirements for both the students and the
schools that participate in the FFEL Program:

> To qualify for financial assistance under
> the FFEL [P]rogram[], a student must, among
> other things, attend an eligible
> institution.  See 20 U.S.C. § 1091(a)(1).
> To be eligible, an institution must enter
> into a program participation agreement
> ("PPA") with the Department.  See id. §
> 1094(a).  A PPA incorporates regulations
> promulgated by the Department, which require
> an institution, inter alia, to administer

---

[1] According to Defendant, as a result of statutory changes enacted in 2010,
loans can no longer be made under this program.  Health Care and Education
Reconciliation Act of 2010, Pub. L. No. 111-152, § 2201, et seq., 124 Stat.
1074 et seq. (2010).

[2] A guaranty agency is "[a] state or private nonprofit organization that has
an agreement with the Secretary under which it will administer a loan
guarantee program under the Act."  34 C.F.R. § 682.200.

> student loan applications, determine whether
> students are eligible for particular
> financial assistance, certify that student
> loan applications are complete and accurate,
> and keep records necessary to administer the
> funds.  See id. § 1094(a)(1)-(6).

Chauffer's Training Sch., 478 F.3d at 120.  In addition, in

order to be eligible, students must, among other things, have a

high school diploma or recognized equivalent, or, during the

relevant times, the institution must have demonstrated the

student's ATB from the specific program that he or she would

attend with the financial aid.  See, e.g., 20 U.S.C. § 1091(d);

34 C.F.R. § 668.32(e).  If an institution fails to adhere to the

requirements of the HEA, the Secretary may, after "reasonable

notice and opportunity for hearing," limit, suspend, or

terminate the institution's participation in the FFEL Program.

20 U.S.C. § 1094(c)(1)(F).


### 2. Discharging FFEL Loans


The HEA provides a mechanism for the discharge of

student loan obligations if a borrower can establish that he or

she meets certain criteria.  20 U.S.C. § 1087(c).  As relevant

here, 20 U.S.C. § 1087(c)(1) provides that for students who

received a covered loan on or after January 1, 1986, "if such

9

student's eligibility to borrow under this part was falsely certified by the eligible institution," then "the Secretary shall discharge the borrower's liability on the loan."

Congress enacted the law now codified at 20 U.S.C. § 1087(c) in response to the OIG's audits and investigations of trade schools and a 1991 formal report made by the Senate Permanent Subcommittee on Investigations. See S. Rep. No. 102-204 at 42 (noting the importance of these investigations); 138 Cong. Rec. S1887-01 (1992) (Statement of Sen. Nunn) ("I commend the committee . . . for their affirmative role in seeing that the investigation's major conclusions and recommendations were reflected in this bill."). The 1991 report detailed significant evidence that proprietary schools were committing fraud and abuse of the student loan program, to students' detriment. See Abuses in Federal Student Aid Programs, S. Rep. No. 102-58 (1991) ("Nunn Report") at 15. The Subcommittee found "widespread abuse and fraud" and that "hundreds of thousands of young people, many of whom come from backgrounds with already limited opportunities . . . [have been] [v]ictimized by unscrupulous profiteers and their fraudulent schools, [and] students have received neither the training nor the skills they hoped to acquire and, instead, have been left burdened with

10

debts they cannot repay . . . ."  Nunn Rept. at 14, 33.   The
Subcommittee held DOE responsible for much of the problem,
citing "gross mismanagement, ineptitude, and neglect in carrying
out its regulatory and oversight functions" and concluding that
DOE "had all but abdicated its responsibility to the students it
is supposed to service and the taxpayers whose interest it is
charged with protecting."  Id. at 33.   Immediately following the
Nunn Report, Congress amended the HEA to provide the relief
noted above.  Pub. L. No. 102-325, § 437(c)(1), codified at 20
U.S.C. § 1087(c)(1).

### a. Regulations Regarding What Constitutes A False Certification

The rules governing the discharge of FFEL Program
loans due to false certification by a school are set forth at 34
C.F.R. § 682.402(e).[3]  "A student's . . . eligibility to borrow
shall be considered to have been falsely certified by the school
if the school" (i) certified the student's ability to benefit
from the training when the student did not meet the applicable

---

[3] Plaintiffs allege in their AC that "[a]ll loans at issue in this Complaint
were issued under the federal financial aid program known as the [FFEL]."
(AC ¶ 19.)  However, because some of the loans at issue in the AC
subsequently were consolidated into Federal Direct Loans, Plaintiffs also
cite certain of the regulations at 34 C.F.R. § 685.215 regarding discharge.
Under either set of regulations, however, Plaintiffs are not entitled to
relief, as discussed further below.

11

ATB requirements; (ii) signed the borrower's name on a loan application or promissory note without authorization by the borrower; (iii) endorsed the student's loan check or authorization for electronic funds transfer without the student's authorization and failed to pay the loan funds to the student, either directly or by crediting the student's account at the school; (iv) certified the student as a result of identity theft; or (v) certified a loan for a student who would not meet the requirements for employment in the student's state of residence in the occupation for which the training program supported by the loan was intended because of a physical or mental condition, age, or criminal record or other reason accepted by the Secretary.  34 C.F.R. §§ 682.402(e)(1)(ii)-(iii), 682.402(e)(13)(iii), 685.215(a).  To qualify for a false-certification discharge, "the borrower must submit to the holder of the loan a written request and a sworn statement."  34 C.F.R. §§ 682.402(e)(3), 685.215(c).

The regulations address the different bases for false certifications, and provide requirements for establishing the facts for each of them.

If a student is seeking a discharge based on a false certification regarding an ATB test, the student must submit a written request and sworn statement stating that he or she received funds during the relevant time (i.e., on or after January 1, 1986), was admitted to the school on the basis of an ability to benefit from the school's training, and did not meet the requirements for such an ability-to-benefit admission.  34 C.F.R. §§ 682.402(e)(3)(ii), 685.215(c)(1).

If the borrower alleges that the certification was false because the school forged his or her signature on loan documents, he or she must also provide "five different specimens or his or her signature, two of which must be not earlier or later than one year before or after the date of the contested signature."  34 C.F.R. § 682.402(e)(3)(iii); see also 34 C.F.R. § 685.215(c)(2)(ii).

For borrowers seeking a discharge because a school endorsed a loan check or signed an authorization for an electronic funds transfer or master check without the borrower's authorization for an electronic funds transfer or master check without the borrower's authorization, he or she must certify that there was no such authorization, provide five signature

13

samples, and "[s]tate that the proceeds of the contested disbursement were not received either through actual delivery . . . or by a credit in the amount of the contested disbursement applied to charged owed to the school."  34 C.F.R. § 682.402(e)(3)(iv); see also 34 C.F.R. § 685.215(c)(3).

Finally, if a student is seeking a discharge as a result of identity theft, the student must certify that he or she did not receive or benefit from the proceeds, provide proof of identity theft in the form of a conclusive court verdict or judgment and, if the verdict or judgment does not address the loan, provide signature samples and a statement of facts that demonstrates "to the satisfaction of the Secretary" that the loan at issue was falsely certified as a result of identity theft.  34 C.F.R. § 682.402(e)(3)(v); 34 C.F.R. § 685.215(c)(4). To obtain a false-certification discharge based on a "disqualifying status," the student must show that he or she would not meet the requirements for employment in the student's state of residence in the occupation for which the training program supported by the loan was intended because of a physical or mental condition, age, or criminal record or other reason accepted by the Secretary.  34 C.F.R. § 682.402(e)(13)(iii); 34 C.F.R. § 685.215(a)(1)(iii).

If a student meets the requirements for a discharge, then the Secretary "shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan."  20 U.S.C. § 1087(c)(1).

### b. Regulations Regarding Suspension of Collection or Notification

There are several regulations regarding suspension of collection or notification to individual borrowers prior to the submission of a discharge application.  First, 34 C.F.R. § 682.402(e)(6) provides that "[a] guaranty agency shall notify the Secretary immediately whenever it becomes aware of reliable information indicating that a school may have falsely certified a student's eligibility."  § 682.402(e)(6)(i).  The guaranty agency then "shall promptly investigate whether the school has falsely certified a student's eligibility and, within 30 days after receiving information that the school may have done so, report the results of its preliminary investigation to the Secretary."  Id.  The regulation also imposes notification requirements in certain conditions on guaranty agencies, by providing:

> If the guaranty agency receives information
> it believes to be reliable indicating that a

15

borrower whose loan is held by the agency
may be eligible for a discharge under
paragraph (e) of this section, the
[guaranty] agency shall immediately suspend
any efforts to collect from the borrower on
any loan received for the program of study
for which the loan was made (but may
continue to receive borrower payments), and
inform the borrower of the procedures for
requesting a discharge.

34 C.F.R. § 682.402(e)(6)(ii); see also 34 C.F.R. §

685.215(d)(1) (parallel provision in context of Direct Loans,

stating that "[i]f the Secretary determines that a borrower's

Direct Loan may be eligible for a discharge," then the Secretary

is required to take certain actions).  The regulations state

that any suspension or notice requirement is triggered only upon

a determination that an individual borrower may be eligible for

discharge.  The regulations also refer to "a borrower whose loan

is held by the agency," rather than broad groups or categories

of borrowers.  The regulations contain no standards or criteria

according to which the guaranty agency, or the Secretary, should

make the determination as to whether a borrower is eligible for

a discharge in this context.

### c. Regulations Regarding Group Discharges

The Secretary is also permitted to discharge a borrower's loan without an application from the borrower if the Secretary determines that the borrower is qualified for a discharge based on information in the Secretary's or guaranty agency's possession. 34 C.F.R. §§ 682.402(e)(15), 685.215(c)(7). In the notice of proposed rulemaking that added this provision to the discharge regulations, DOE explained:

> We (or a guaranty agency) occasionally learn of information that strongly suggests that all borrowers in a certain category would likely qualify for a false certification discharge. For example, we might determine that all students at a specific school during a certain time period had incorrect ATB determinations. In the interest of assisting those borrowers, (many of whom may be unaware of the possibility of receiving a loan discharge), the committee decided that it would be appropriate to discharge those loans without an individual discharge request from each borrower.

Federal Family Education Loan (FFEL) Program and William D. Ford Federal Direct Loan Program, 65 Fed. Reg. 46316, 46318 (July 27, 2000). The regulation contains no criteria or standards as to what type of information the Secretary can or should consider in making this determination, when the information can or should be

17

considered, or what other factors can or should be taken into
account.

### d. "Dear Colleague" Letters

"Dear Colleague" letters are a form of informal
guidance from the DOE to the regulated community explaining
DOE's interpretation of its regulations, among other things.
DCL GEN-95-42 addresses loan discharges based on incorrect ATB
determinations.

One of the questions presented in DCL GEN-95-42 is
what constitutes sufficient evidence for an ATB-based false-
certification discharge when the borrower presents no
information in support of his or her claim and the guaranty
agency has no specific information about the ATB testing
practices of the school in question.  DCL GEN-95-42 at Question
1.  The response explains that guaranty agencies should consider
evidence beyond the applicant's statement and draw appropriate
inferences from this evidence.  Id.  The response further notes
that guaranty agencies must consider that the borrower may be
motivated by financial self-interest; to that end, if there is
no other evidence beyond the application, the application alone

18

will not justify a discharge.  Id.  Accordingly, DOE "expects a guaranty agency to obtain existing documentation available from any public or private agency that reviewed or had oversight responsibility for the school," and if there is no such documentation or it does not support the application, "it becomes the responsibility of the borrower making the claim to produce persuasive evidence that would corroborate his or her allegation of improper ATB determination."  Id.  There is no express requirement that the guaranty agency or DOE use this evidence for any type of across-the-board discharge or notification.

DCL GEN-95-42 also addresses "group discharges," explaining that "[i]n some cases, discharge may be authorized by the Department for borrowers who demonstrate that they fall within a particular cohort of students and who are otherwise eligible for false certification discharge."  DCL GEN 95-42 at Question 10.  The letter further explains that "[a]ll borrowers will, however, still be required to request a discharge and sign the sworn statement prescribed by the regulations" and that DOE will let the guaranty agencies know "when it has made such a determination."  The letter invites interested parties to submit evidence that may be relevant to such determination.  Id.

19

Another letter, DCL FP-07-09, supplements DCL GEN-95-42 with regard to how guaranty agencies evaluate discharge applications based on allegedly improper ATB testing.  This letter notes that even if there are reports of improper ATB practices at the school in question, such reports alone do not justify a discharge if there is other information showing that the discharge application is insufficient.  DCL FP-07-09 at 2.

DCL FP-07-09 elaborates on guaranty agencies' recordkeeping responsibilities, explaining that they "must maintain a school-by-school record" regarding details about discharge applications that they must share with the Secretary on request.  Id.  Finally, DCL FP-07-09 explains that in those cases in which there is no evidence that the ATB tests were proper other than the absence of oversight report findings and no evidence that the borrower is not qualified for a discharge, guaranty agencies must consider how many other applications were submitted by students of the school in the same time period, "as well as the possibility that there has been collusion among the students in submitting the applications received."  Id.  In these circumstances, guaranty agencies also should give weight to withdrawal rates and annual loan default rates as evidence of improper ATB practices.  Id. at 3.  There is no requirement in

20

DCL FP-07-09 that any of this evidence be used for any across-the-board action for all students at a particular school.

**Applicable Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). However, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion requires the plaintiff to "'allege in [its] pleading the facts essential to show jurisdiction,' and [to] 'support (those facts) by competent proof.'" Sierra v. United States, No. 97 Civ. 9329, 1998 WL 599715, at *4, 1998 U.S. Dist. LEXIS 14135, at *10-11 (S.D.N.Y. Sept. 9, 1998) (quoting McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 785, 80 L.Ed. 1135 (1936) (additional citations omitted)). Plaintiffs bear the burden of establishing jurisdiction. Id.; see also Bagnall v. Sebelius, No. 11 Civ. 1703(MPS), 2013 U.S. Dist. LEXIS 135251, at *19-20 (S.D.N.Y. June 13, 2013).

**There Is No Adequately Alleged Final Agency Action That May Be Subject To Judicial Review**

Plaintiffs assert that the DOE's continued enforcement of the proposed class members' loans and rejection of Plaintiffs' counsel's request for a group discharge are reviewable under the APA because the collection on the loans in question and rejection of the group discharge request both constitute "final agency action." Defendant contends that the neither the DOE's continued collection activity nor its decision not to mail discharge applications to all Wilfred students

constitute final agency action as neither mark the consummation
of the agency's decisionmaking process.

Under the APA, actions not made explicitly reviewable
by statute are reviewable only when they are "final."  5 U.S.C.
§ 704.  Two conditions must be satisfied for an action to be
considered "final" pursuant to the APA.  "First, the action must
mark the consummation of the agency's decisionmaking process --
it must not be of a merely tentative or interlocutory nature.
And second, the action must be one by which rights or
obligations have been determined, or from which legal
consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78
(1997) (quotations and citations omitted).  Thus, "if the
practical effect of the agency action is not a certain change in
the legal obligations of a party, the action is non-final for
the purpose of judicial review."  Nat'l Ass'n of Home Builders
v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005).

Plaintiffs contend that the Defendant's refusal to
take broad action through group discharge satisfies the two
Bennett prongs because even though the Defendant "has known . .
. for decades[] that Wilfred routinely committed fraud" and "no
new information about Wilfred's routine abuse of the student

23

loan program is likely to emerge, given that Wilfred has been
closed for decades," the Defendant has concluded "that only
those who fortuitously learn of the availability of false
certification discharge will be relieved of the obligation to
pay a loan [that] is invalid and statutorily eligible for
discharge." (Pls.' Opp'n 9.) Plaintiffs assert that such a
conclusion affects "rights and obligations" and has "legal
consequences" because the practical effect of the Defendant's
decision not to grant group discharge is that students whose
loans were falsely certified, but may not be aware that they are
potentially eligible for a discharge, continue to experience
interception of their tax refunds, adverse credit reports, and
wage garnishment. (Pls.' Opp'n 10.) Plaintiffs further contend
that Defendant's rejection of Plaintiffs' letters (AC ¶ 121)
resolved the request for a group discharge and thus may be
treated as an order which affects the rights and obligations of
the Plaintiffs and proposed class members. (Pls.' Opp'n 11-12.)[4]

---

[4] Plaintiffs separately contend that the issues presented in this action are
ripe for judicial review, citing Gupta v. S.E.C., 796 F. Supp. 2d 503, 510
(S.D.N.Y. 2011) to support their argument. (Pls.' Mem. 8 n.5.)   Gupta,
however, is inapposite as it involved multiple claims that implicated both
the question of whether the plaintiff had to exhaust administrative remedies
before petitioning for judicial review and whether the S.E.C. did or did not
have exclusive jurisdiction over some of plaintiffs claims, such that
judicial review was appropriate. In order to determine whether a challenge
to administrative action is ripe for judicial review, the Court must consider
"both the fitness of the issues for judicial decision and the hardship to the
parties of withholding court consideration."   New York Civil Liberties Union
v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008). In Gupta, the ripeness

While compelling, Plaintiffs do not adequately plead finality.  Even if DOE granted Plaintiffs' counsel's request to notify all Wilfred student loan debtors of their right to apply for a discharge, a student would not be eligible for a false certification discharge unless he or she satisfied the requirements set forth in the applicable regulations.  See 34 C.F.R. §§ 682.402(e)(3), 685.215(c).  The DOE does not know whether a loan is eligible for discharge until it reviews the discharge application and other relevant information in accordance with the regulations and a borrowers' legal obligations regarding any possible discharge necessarily will not be determined unless the borrower submits a discharge application and DOE conducts this review.  Until such application is submitted, a borrower's rights to apply for a discharge, or a borrower's entitlement to a discharge, are in no way curtailed.  As a result, there has been no "consummation of the agency's decisionmaking process" with respect to any loans that might be eligible for discharge until an application has been submitted, reviewed, and resolved, one way or the other.

---

inquiry was "inseparable" from whether the Court had jurisdiction to consider Gupta's claims and whether he was "required to exhaust administrative remedies."  796 F. Supp. 2d at 510.  Such are not the factual circumstances presented here.

Plaintiffs cite, in further support of their arguments, Sharkey, 541 F.3d at 88 and New York v. E.P.A., 350 F. Supp. 2d 429, 435 (S.D.N.Y. 2004) for the proposition that finality is evaluated by examining the pragmatic effect of the action – or inaction – complained of and that maintenance of the status quo can be final for purposes of judicial review under the APA. (Pls.' Opp'n 8, 10.) However, in both cases, the agencies in question in fact issued a definitive statement of their positions, which directly affected the rights of the parties involved. In Sharkey, the agency revoked an alien's previously granted lawful permanent resident status. In New York v. E.P.A., the agency reevaluated, as required by statute, tolerances for certain pesticides and determined (through what the agency itself called an "exhaustive scientific and regulatory effort") that an existing tolerance should be left in place. The actions in Sharkey and New York v. E.P.A. were not "interlocutory" or "tentative" but instead represented decisions with binding, final effect. Here, the DOE has declined to take action not required by either the HEA or relevant regulations and has made no determination, one way or the other, with respect to the eligibility for discharge of the named or proposed class members who have not submitted applications.

26

Plaintiffs also cite to a handful of decisions for the proposition that individuals have obtained judicial review under the APA of written agency responses to specific requests, even when such requests were not submitted pursuant to a formal process.  (Pls.' Opp'n 12.)  The one applicable Second Circuit case cited, however, does not support Plaintiffs position.  In Christianson v. Hauptman, 991 F.2d 59 (2d Cir. 1993), a homeowner on Fire Island (Christianson) submitted a petition to the National Park Service ("Service") requesting that the Service reconsider its rescission of a long-standing exemption that allowed the operation of seaplanes and amphibious aircraft in the community of Robbins Rest.  Christianson both challenged that the Service had acted arbitrarily and capriciously when it removed Robbins Rest's exemption, as well as when it declined to enact a regulatory change to restore Robbins Rest to its previous exempted status.

At issue and central to Christianson's letter to the Service — and the court's opinion - was a concrete action by the agency that was both final and had legal consequences: the termination of a privilege previously provided.  Christianson does not stand for the proposition that any response by an agency to a request, submitted formally or not, may be subject

to judicial review.  Christianson is more properly read to counsel that when an agency takes a final action, it is possible that an individual may obtain judicial review of an agency's decision not to change its mind with respect to that final action, even if the request that the agency change its mind was made informally.  Other cases cited by Plaintiffs are similarly unavailing.  See Menkes v. U.S. Dep't of Homeland Sec., 637 F.3d 319 (D.C. Cir. 2011) (upholding termination of plaintiff's appointment as an independent pilot); Humane Soc'y of the U.S. v. U.S. Postal Serv., 609 F. Supp. 2d 85 (D.D.C. 2009) (finding that the Postal Service's denial of plaintiff's request effected the legal status of the periodical in question because it determined definitively whether the periodical was "mailable" under relevant statutes).

Plaintiffs effectively demand that the Secretary exercise his discretion in a way that does more than what is required, by suspending collection on all of the loans for those people who attended Wilfred schools, conducting a nationwide investigation, sending out notices to all possibly affected students and discharging the loans on a group-wide basis.  Such a demand, however, can be characterized as a "broad programmatic attack," which has been rejected by the Supreme Court.  See

28

SUWA, 542 U.S. at 64; see also Lujan v. National Wildlife
Federation, 497 U.S. 871 (1990).  In Lujan, the Court explained
that "[u]nder the terms of the APA, [a litigant] must direct its
attack against some particular 'agency action' that causes it
harm."  497 U.S. at 891.  This is because parties "cannot seek
wholesale improvement of [a] program by court decree, rather
than in the offices of the Department or the halls of Congress,
where programmatic improvements are normally made."  Id.

Plaintiffs contend that Lujan is distinguishable from
the instant case because whereas in Lujan the plaintiff
attempted to characterize as a "program" disparate aspects of
ongoing operations of the defendant agency, here Plaintiffs have
"challenged a narrowly defined series of actions taken by
Defendant."  (Pls.' Opp'n 7-8.)  Plaintiffs assert that they are
seeking judicial review of a specific failure to "follow a
statutory mandate . . . and to act in a non-arbitrary manner in
light of the evidence" relating to Wilfred loans – in effect,
they challenge the DOE "knowingly taking actions to collect
loans that meet the statutory requirements for discharge."
(Pls.' Opp'n 8.)  However, nothing in the HEA or its
implementing regulations requires DOE to suspend collection
without information that a particular loan may be eligible for

29

discharge or requires the DOE to initiate an investigation
and/or issue a group discharge.  Indeed, not all of the loans
issued by Wilfred are necessarily eligible for discharge, as
Plaintiffs concede.  (Poscablo Decl. Ex. B.)  As further
discussed below, the relevant regulatory scheme sets out certain
obligations on the Secretary only as to individual applications
that he receives and does not require the investigatory and
notification action that Plaintiffs seek.[5]

Because no final agency action is implicated, judicial
review is unwarranted.

**DOE's Determination Not To Take The Steps Plaintiffs Demand Is
Committed to Agency Discretion By Law And Not Subject To
Judicial Review**

Even if the agency action, or inaction, to which
Plaintiffs point were final, the determination of eligibility
for discharge is committed to agency discretion, and none of the

---

[5] Plaintiffs cite to Riverkeeper, Inc. v. Collins, 359 F.3d 156, 168 (2d Cir.
2004) for the proposition that the DOE has abdicated its duty under the HEA.
(Pls.' Mem. 14.)  Riverkeeper itself, however, makes clear that a failure to
enact the specific changes requested by a plaintiff cannot on its own
constitute an abdication of responsibility as it would create "jurisdiction
on an 'abdication' basis every time an administrative agency declines to
order demanded action on an asserted discrete, perceived problem within its
area of statutory responsibility."  359 F.3d at 169.

provisions cited by Plaintiffs limit the DOE's discretion in the way that Plaintiffs contend.

"In determining whether a suit can be brought under the APA, '[w]e begin with the strong presumption that Congress intends judicial review of administrative action." Conyers v. Rossides, 558 F.3d 137 (2d Cir. 2009) (internal citations omitted). However, review under the APA may be excepted where agency action "is committed to agency discretion by law." Lunney v. United States, 319 F.3d 550, 558 (2d Cir. 2003) (quoting Lincoln v. Vigil, 508 U.S. 182, 190-91 (1993)); see also 5 U.S.C. § 701(a)(2). The bar to judicial review contained in 5 U.S.C. § 701(a)(2) applies both when the statute at issue is written in such broad terms that "there is no law to apply," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971), and when the language of the statute "'is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion,'" Lunney, 319 F.3d at 558 (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985) (emphasis in original). There is generally no review of agency determinations regarding an agency's decision "to institute investigative or enforcement proceedings," because such determinations "often involve[] a complicated balancing of a

31

number of factors which are peculiarly within [the agency's] expertise." Chaney, 470 U.S. at 831, 838; see also Riverkeeper, 359 F.3d at 164-65 (noting that "Chaney included among those agency actions presumptively exempted from judicial review by section 701(a)(2) agency decisions not to institute a particular enforcement action").

Section 1087(c)(1), in which the mechanism for the discharge of student loan obligations is found, provides "no meaningful standard" against which the Court can review DOE's discretion as to whether to take the action Plaintiffs demand, as this section applies only if the Secretary has already determined that there has been a false certification.  Generally speaking, the regulatory scheme around discharge sets out certain obligations on the part of the Secretary only as to individual applications that he receives, or, as set forth in 34 C.F.R. § 682.402(e)(6) and § 685.215(d)(1), if the Secretary or a guaranty agency determines that a borrower may be eligible for discharge.  Section 682.402(e)(6) requires that the guaranty agency conduct an investigation into a particular school or to suspend collection efforts and inform the borrower at issue only upon determining that it has in its possession "reliable

information" indicating that the borrower may be eligible for discharge.

Because these regulations mandate certain steps only upon a threshold determination by the guaranty agency that is (a) reliable and (b) indicates that a particular borrower might be eligible for discharge, they do not provide "law to apply," which the Court could rely on to review the Defendant's decision not to suspend all collection efforts, notify all Wilfred students about the discharge procedures or conduct an investigation of all Wilfred students about the discharge procedures or conduct an investigation of all Wilfred loans.

Plaintiffs contend that the procedures set forth in 34 C.F.R. §§ 682.402(e), 685.215(c) and 682.402(e)(15) provide meaningful standards against which to measure Defendant's actions.  These provisions, however, lay out what prerequisite documentation a borrower must provide to the DOE in order to qualify for an eligibility review, and do not provide guidance on the sorts of actions Plaintiffs request Defendant to take.

Though not perfectly analogous, New York Public Interest Research Group ("NYPIRG") v. Whitman, 321 F.3d 316 (2d

33

Cir. 2003) provides some guidance on agency discretion.  In

NYPIRG, the statute at issue provided that the agency "shall"

undertake regulatory action, but only "[w]henever the [agency]

makes a [certain] determination."  321 F.3d at 330.  The Court

held that, "[b]ecause the determination is to occur whenever the

[agency] makes it, the determination is necessarily

discretionary."  Id. at 330-31.  "Once that determination is

made, certain statutorily mandated consequences . . . follow;

but the decision whether to make that determination as an

initial matter is a discretionary one."  Id.  Here, the

Secretary similarly has no regulatory obligation to conduct an

investigation, suspend collection, or send a discharge

application to an individual borrower unless he makes an initial

determination that an individual borrower may be eligible for

discharge, but whether and when to make that determination

appears to rest in the Secretary's discretion.


          Plaintiffs contest analogy to NYPIRG, asserting that

the lack of explicit reference to agency discretion in § 1087(c)

makes the comparison unavailing.  (See Pls.' Opp'n 22.)

However, the absence of the word "discretion" or "determination"

does not make these cases dissimilar.  In NYPIRG, the statute at

issue provided that "[w]henever the [EPA] makes a determination

that a permitting authority is not adequately administering and
enforcing a program . . . in accordance with the requirements of
this subchapter, the [EPA] shall provide notice to the State."
NYPIRG, 321 F.3d at 330.  Here, § 1087(c) provides that "[i]f a
borrower who received, on or after January 1, 1986, a loan made,
insured, or guaranteed under this part and . . . the student's
eligibility to borrow under this part was falsely certified . .
., then the Secretary shall discharge the borrower's liability
on the loan . . . ."  In NYPIRG, EPA was required to take action
only after it determined that a permitting authority was not
administering and enforcing a program in a particular way.
Here, DOE is required to take action only after determining that
a loan was issued on or after January 1, 1986, and was falsely
certified.

        The determination that a borrower is eligible for a
discharge must necessarily occur before the Secretary's
obligation to discharge falsely certified loans is triggered and
the regulations do not contain any criteria as to what type of
information DOE should consider in making this eligibility
determination, when the information can or should be considered,
or what other factors should be taken into account.
Furthermore, the regulations offer no guidance on what action

35

the Secretary can, much less must, take in the absence of an
application save for 34 C.F.R. § 682.402(e)(15), which states
that a loan "may be discharged without an application if the
Secretary . . . determines that the borrower qualifies for a
discharge . . . ." (emphasis added); see also Chaney, 470 U.S.
at 838 (". . . we essentially leave to Congress, and not to the
courts, the decision as to whether an agency's refusal to
institute [investigative or enforcement] proceedings should be
judicially reviewable").[6]

C.F.R. §§ 682.402(e)(15) contains no standards by
which to evaluate the Secretary's determination that a borrower,
or group of borrowers, may be eligible for a discharge absent an
application, the information on which such determination might
be based, or the circumstances in which the Secretary might
consider such evidence in the first instance.  The regulation is
permissive: it states that the Secretary "may" grant a discharge
upon a determination by the Secretary.  As such, it appears the

---

[6] Plaintiffs also generally contest application of Chaney to this action,
asserting that Chaney applies only to the narrow category of "agency
decisions to refuse enforcement," whereas here, Plaintiffs contend, Section
1087(c) does not confer any enforcement authority with respect to discharging
loans, but rather "an affirmative, non-discretionary obligation."  (Pls.'
Opp'n 18-19.)  However, the circumstances here do not make a comparison to
Chaney inappropriate, as Plaintiffs arguably seek an agency, the DOE, to
enforce statutes and regulations under its authority in a manner not
explicitly required.

decision as to whether to grant a group discharge is within the Secretary's discretion and therefore not subject to judicial review.

Plaintiffs also assert that DCL Gen-95-042 provides guidance on "group discharges" and provides "law to apply" to this case by identifying "the type of documentation" that will be considered in order to determine whether a "school committed pervasive and serious violations of the Department's regulations[.]" DCL Gen-95-042. Plaintiffs contend that Defendant has acted in accordance with this procedure in the past when reviewing group discharge requests (AC ¶ 117) and those actions, taken together with the language of the DCL, evidence an intention to be bound. (Pls.' Opp'n 23.) However, the regulations cited by Plaintiffs do not require DOE to suspend collection activities on a group-wide basis and DCL Gen-95-42 contains no criteria regarding how DOE will exercise its discretion in making determinations as to when to permit group discharges. The letter states that, while in such cases the Secretary may grant discharges without the borrowers being required to individually present proof of an improper determination of ATB or admission, "all borrowers will, however, still be required to request a discharge and sign the sworn

37

statement prescribed by the regulations" (i.e., the discharge application form).  See DCL Gen-95-42 at Question 10.

**Plaintiffs Have Not Established A Failure To Comply With Any Statutory or Regulatory Obligation**

When an APA action is brought to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), that claim "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 64 (2004). Where an agency is not "legally required" to undertake a discrete action, a court cannot compel it to undertake that action.  Id. at 63; see also Benzman v. Whitman, 523 F.3d 119, 130-31 (2d Cir. 2008) (no remedy available to plaintiffs under section 706(1) of the APA where they could not point to any statute or regulation that "required" agency to undertake action that formed the basis for plaintiff's claims).

The general provisions in 20 U.S.C. §§ 1070 and 1087 establish that the Secretary has the authority and obligation to discharge individual loans that were in fact falsely certified but contain no requirement that the Secretary send out notifications or discharge any loans without determining that

38

the individual borrower at issue has met the requirements for a false-certification discharge.  34 C.F.R. § 682.402(e)(6), cited by Plaintiffs, only imposes requirements on guaranty agencies to take certain actions if they make a determination that there is reliable information that a particular borrower may be entitled to discharge.[7]

Plaintiffs have failed to establish a basis for judicial review of the DOE's conduct, or alternatively, lack of conduct.  Plaintiffs contend that "to give full relief to Plaintiffs . . . the Court may simply order the agency to act []
to discharge the loans of class members, which were falsely certified as defined by the statute."  (Pls.' Opp'n 16.)
Implicit in this request, however, is the request that the Court, in effect, order the DOE to institute an investigation into thousands of people (Pls.' Mem. in Supp. of Class Certification 9) in order to determine whether they are eligible for discharge.  Whether or not it would be preferable that such an investigatory duty exist, as the HEA is written, such large-scale investigation is not, in fact, required.  Because the DOE

---

[7] Plaintiffs also cite 34 C.F.R. § 685.215(a)(1), which applies only to Direct Loans, and which does not mandate that the Secretary make a determination as to any particular borrower prior to review of the borrower's application. This provision may be read together with 34 C.F.R. § 685.215(d)(1), which leaves the determination as to whether the particular borrower is eligible for discharge to the Secretary's discretion.

39

is not "legally required" to take such action, <u>SUWA</u>, 542 U.S. at 63, Plaintiffs arguments on this score must fail.

The AC must then, necessarily, be dismissed, despite the reality and credibility of Plaintiffs' grievances.

## Injunctive Relief And Class Certification

While the spirit behind the enactment of 20 U.S.C. § 1087(c) arguably supports Plaintiffs cause, the statute and its implementing regulations' construction do not.  Defendant's arguments regarding injunctive relief and motion for class certification are denied as moot in light of the dismissal of the Plaintiffs' AC.

## Conclusion

For the conclusions stated above, Defendant's motion to dismiss is granted, and Plaintiffs' motion for class certification is denied.

It is so ordered.

New York, NY
January  6  , 2015

ROBERT W. SWEET
U.S.D.J.

41